IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


FRANCIS LEON HARVEY,

                    PLAINTIFF,

vs.                                                    No. CV  00107-MCA-RLP

UNITED STATES OF AMERICA,

                    DEFENDANT.


MEMORANDUM IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT

          Comes now Plaintiff, Francis Leon Harvey, by and through counsel and moves

this court for partial summary judgment requesting a finding that this Federal Tort Claims

Act, (FTCA), case is governed by the tort law of the Navajo Nation, the place where the

act or omission occurred.  This conclusion flows directly from the "ordinary meaning" of

the language of 28 U.S.C. § 1346(b)(1), i.e., the Navajo Nation is the "place" where the

act or omission occurred.  Richards v. United States, 369 U.S. 1, 9-13 (1962) (FTCA

interpreted by applying the ordinary meaning of its language); Cheromiah v. United

States., 55 F. Supp.2d 1295 (D. N.M. 1999).  It also flows from the application of the law

of conflict of laws of the state of Arizona, see, e.g., Brown v. Babbitt Ford Inc., 571 P.2d

689 (Ariz. App. Div. 1 1977), as required by Richards v. United States, 369 U.S. 1, 9-13

(1962) (the FTCA requires application of all laws of the "place" including conflict of

laws).  Finally, applying Navajo law to this case would allow the United States to be

adjudged in the "same manner and the same extent as a private individual under like

circumstances" as required by 28 U.S.C. § 2674.


1

It is appropriate that this issue be address early on in this case in that the law of the case will affect how this case proceeds.

I.  FACTUAL BACKGROUND

The Plaintiff, Francis Leon Harvey is a Navajo Indian. The Navajo Nation is the largest reservation in the United States, encompassing more than 26,000 square miles.  It lies within three states; Arizona, New Mexico and Utah.  Mr. Harvey's home is on the Navajo Reservation where it lies in the state of New Mexico near the state of Arizona, though he sometimes lives in Albuquerque where his son lives.

The first part of February 2004, Mr. Harvey slipped and fell on the ice.  He fell on his right hand and his left knee.  He also injured his right rib area.   When he did not see improvement in a few days, on February 6, 2004, he went to the Fort Defiance Indian Hospital for treatment of his injuries.   Fort Defiance Indian Hospital is located on the Navajo Reservation where it lies in the state of Arizona, upon trust land.  The Indian Heath Services (IHS), an agency of the United States Government, pursuant to a lease with the Navajo Nation, operates the Fort Defiance Indian Hospital.

The medical record from February 6, 2004, states that the base of Mr. Harvey's right fifth digit was swollen and the joint was tender.  The medical record for that date also states "X-rays all ok."   This is an interesting notation in light of the fact that the radiology report of that same date, under "Impression" states:  "There is a fracture of base of the fifth metacarpal of the right hand which enters the carpometacarpal joint."   In the Comment section it states:  "There is moderate radial and distal displacement of the large fracture fragment."

In spite of the X-ray results which clearly show a fracture, the treatment the IHS gave for his injuries was "ice pack" for the knee and hand along with Motrin for the pain. Mr. Harvey was told to return if there was no improvement.  On the back side of the medical record form it indicates after "follow up":  "1 month . . . for complete EXAM."

Mr. Harvey was told by an IHS health care provider that his hand was only bruised and that it should get better on its own.

On March 5, 2004, Mr. Harvey returned to the Clinic at Fort Defiance.  He stated that his hand pain was continuous, giving it a 5 on a 1 to 5 scale.  Again, the medical record states, "X-rays were ok."

On March 29, 2004, Mr. Harvey again returned to the clinic.  Although the pain had subsided, he complained that it was tender at the base of his right fifth finger.   X-rays were taken again.  Again, the X-rays revealed "[a] fracture at the base of the fifth metacarpal involving the articular surface."

After this second X-ray indicating the fracture, the IHS finally acknowledge the fracture.  The medical record states that there is an increased joint space at the right metacarpal carpal.  The note also indicates "needs to see ortho ASAP."  Mr. Harvey was given a right hand splint.  He was scheduled for follow up with orthopedics in two weeks.

On April 20, 2004, Mr. Harvey was seen at the Ortho Clinic.  The medical record notes that the X-rays show there is a fracture with ulnar displacement of the shaft and distal radial displacement of the evulsed fragment.   The language quoted makes it clear that this information is from the February 6 X-ray and not the March 29 X-ray.

An open reduction internal fixation surgery was performed on May 5, 2004--over three months after the injury.  The radial collateral ligament was reattached to the fifth

metacarpal base.  After the surgery Mr. Harvey was given an ulnar gutter fiberglass splint.

His sutures were removed on May 13, 2004.  A new cast was applied.  He was told to follow up in a month for pin and cast removal.

On June 10, 2004, he went in as directed.  On the 16th of June he returned because his hand was swelling up and he was experiencing pain.  He was at that time told that it would take a year for his hand to get back to normal.

On March 21, 2005, Mr. Harvey returned to the clinic for a follow up on his hand. Having noted that the tinel's test was positive, the doctor's impression was that Mr. Harvey had right guyon canal-ulnar nerve entrapment.  The doctor's plan was to "wear wrist support" and "go to physical therapy/occupational therapy."   Mr. Harvey was told by an IHS health care provider that it would take yet another year for his hand to get back to normal.

In April, 2006, when his hand had not returned to normal, Mr. Harvey filed an administrative FTCA claim against the Indian Health Service/Public Health Service.

The standard of care for a fracture at the base of the metacarpal is closed reduction with splinting of the hand for two weeks where there is minimal displacement. Where there is significant displacement or dislocation, the standard of care is ORIF (open reduction internal fixation).  Dye, Michael T., Metacarpal Fracture, e-Medicine.com/orthoped/topic193. ( T Michael Dye, MD:  Orthopedic Surgeon, Surgical Critical Care Element Chief, Department of Orthopedic Surgery, Eglin Air Force Base, Hurlburt Field, Florida.)

Immobilization of the reduced metacarpal base fracture should be continued for a minimum of 3-4 weeks.  Active motion of the finger IP (interphalangeal) joints should be encouraged throughout the immobilization period.  Id.

It is essential that early motion is instituted to ensure good outcome.  "Delaying motion beyond 3-4 weeks can lead to artrofibrosis and poor functional outcome.  Optimal surgical treatment should allow for near-immediate postoperative motion, and patients should be encouraged to move their fingers on a daily basis."  Id.

"Complications of the treatment of CMC joint fractures and dislocations include recurrent dislocation and arthritis of the involved joint.  Anthrosis is more likely to involve the relatively mobile 4th and 5th CMC joint and can best be avoided by achieving stable anatomic reduction and avoiding prolonged immobilization."  Id.

The Indian Health Service/Indian Hospital breached the standard of care in the following regards:

1.  On February 6, 2004, when the X-rays showed that the base of the fifth metacarpal of the right hand was fractured, there was no medical intervention.  There was no splinting and no ORIF.  There was no consult to orthopedics.

2.  Again when Mr. Harvey went to the clinic on March 5, 2004, no health care provider read the February 6 X-ray report.  No one ordered a splint or a consult with Orthopedics.

3.  On March 29, someone finally read the X-ray reports and realized that Mr. Harvey was suffering a fracture at the base of the fifth metacarpal

on his right hand.  He was given a consult to orthopedics.  It took orthopedics until May 5 to perform the required surgery—over a month after they finally read the X-rays; three months after the injury.

4.        Even when the doctors finally read the radiology report on March 29, and saw that there was a fracture, they did not encourage Mr. Harvey to move his fingers.  Indeed it was not until March 21, 2005, over a year after the injury, that there was any mention in the medical treatment record of movement of the hand and that was merely a reference to physical/occupational therapy.  It is unclear as what was actually meant by this or if the therapy would include movement of the finger joints.  There is no physical therapy record which relates to the therapy of the hand.

As a result of the Indian Hospital's failure to meet the standard of care Mr. Harvey's hand does not function properly.  He is experiencing the following:

1.   As indicated by the positive tinel's, he has ulnar nerve damage.

2.   He has guyon canal-ulnar nerve entrapment.

3.   He has developed "[m]arked osteopenia of all bones of the right hand."

4.   He has arthosis.

5.   His hand cannot form a fist.  It is clumsy.  He cannot do fine detail work.

6.   His hand hurts with the pain radiating into his arm.

6

7.   The muscles of his hand and his arm are atrophying.

8.   When he tries to use his right hand it swells up and hurts even more.

Mr. Harvey's life has been inexorably changed as a result of the breach of the standard of care by the IHS.  Had the IHS properly treated his hand, it would have been completely healed in 6 weeks.

Mr. Harvey is right hand dominate.  Before his hand was irreparably damaged as a result of the malpractice of the HIS, Harvey did a lot of heavy chores around the house like chopping wood, lifting heavy things, construction work.  He can no longer do those things.  He also did household chores like sweeping, washing dishes and helping his wife move furniture.

He now is also limited in his ability to play with his grandchildren.  For example, he cannot play softball or basketball.

Mr. Harvey is also unable to participate and perform in spiritual activities like the sweat lodge ceremony of the Native American Church which requires use of the right hand.  Also, he cannot actively participate in the Navajo traditional ceremonies.

Mr. Harvey was an accomplished silversmith, making fine Navajo jewelry.   The clumsiness of his right hand makes it impossible for him to do this any more.  He has not only lost the income, he has lost the satisfaction and joy of creating a thing of beauty so important in his culture.

He also used to be able to drive long distances, but now he gets a pain in his hand and arm and then his back when he has tried to drive long distances.  This is especially significant because his wife's family lives near the Window Rock, AZ area and his son

lives in Albuquerque.  He also used to drive a lot in order to go to conferences and pow pows where he sold his jewelry.

He is also unable to help others sell their jewelry because he cannot carry the jewelry around and show it.

Finally, his hand continues to be achy with the pain radiating up into his arm. This constant, nagging pain has negatively affected his mental capacity.  It also makes him feel restless.

II. <u>THE FTCA REQUIRES THE APPLICATION OF NAVAJO LAW</u>

The Federal Tort Claims Act (FTCA) provides in pertinent part at 28 U.S.C. § 1346(b)(1) (emphasis added):

> the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for . . . personal injury or death caused by the negligent or wrongful act or omission of an employee of the Government while acting within the scope of his office or employment, <u>under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the *law of the place* where the act or omission occurred</u>.

28 U.S.C. § 2674 provides (emphasis added):

> The United States shall be liable, respecting . . . tort claims, <u>in the same manner and to the same extent as a private individual under like circumstances,</u> but shall not be liable for interest prior to judgment or for punitive damages.

The United States Supreme Court has indicated that the word "place" in § 1346 means the "political entity" where the alleged tortuous activity occurred.  <u>Hess v. United States</u>, 361 U.S. 314, 319, n. 7 (1960).   The United States Supreme Court further interpreted the language of §§ 1346 & 2674 in <u>Richards v. United States</u>, 369 U.S.  1 (1962), an FTCA case in which an act occurred in one state, Oklahoma, and the result of that act, death, occurred in another state, Missouri.   The plaintiffs had recovered the

maximum allowable, $15,000, under the Missouri Wrongful Death Act and sought further recovery in Oklahoma under Oklahoma's more favorable law which did not limit recovery.  The case was dismissed by the Oklahoma District Court holding that the Oklahoma conflict of law rule would refer the court to the law of Missouri.  The dismissal was affirmed by the Court of Appeals for the Tenth Circuit.

The plaintiffs argued that the FTCA mandate that the law of the place "where the act or omission arose" governs the claim requires that the Oklahoma Wrongful Death Act be applied because the alleged wrongful conduct occurred in Oklahoma.  In resolving this issue, the Supreme Court noted that in this case it was faced with an event that touched on two "place[s]," "a problem which Congress apparently did not explicitly consider." Id. at 8-9.

The Supreme Court began its analysis noting that "we must, of course, start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used. "  Id. at 9.  It stated further, "We believe that it would be difficult to conceive of any more precise language Congress could have used to command application of the law of the place where the negligence occurred than the words it did employ in the Tort Claims Act."  Id.  Consequently, the Supreme Court held that the law of the place where the act or omission occurred, in that case, the State of Oklahoma, governs the FTCA claim.  Id.

The Supreme Court went on to hold that reading the statute as a whole, with due regard to its purpose, requires application of the whole law of the state where the act or omission occurred, including the state's conflict of laws rules.  Id. at 11.  Because

Oklahoma's conflict of law rule would require application of Missouri law, the Supreme Court affirmed the dismissal of the claim.  Id. at 16.

The Court set forth two factors it used in interpreting the language of the FTCA. First, the interpretation "enables the federal courts to treat the United States as a 'private individual under like circumstances.'"  This factor is required in order for the interpretation to be consistent with the act as a whole.  Id. at 12 (quoting § 2674).

The second factor is that the interpretation "provides a degree of flexibility to the law to be applied in federal courts."  Id.  It noted that allowing flexibility is more in step with the character of the legislation and the purpose of the act as a whole.  Id. at 13. Further, it stated, that "in the absence of persuasive evidence to the contrary we do not believe that Congress intended to adopt the inflexible rule urged upon us by the petitioners."  Id.

**A.   The "place" where the act or omission occurred is the Navajo Nation.**

The acts or omissions which are relevant to the litigation at bar all occurred at Fort Defiance Indian Hospital which is located within the boundaries of the Navajo Nation.  The "place" where the acts or omissions occurred is the Navajo Nation. Therefore, pursuant to the "ordinary meaning" of the language of the FTCA, it is the law of the Navajo Nation which controls this litigation.  Richards v. United States, 369, U.S. 1, 9 (1962).  Cheromiah v. United States, 55 F. Supp.2d 1259, 1301-02 (D.  N.M. 1999).

This interpretation is consistent with the two factors set forth in Richards for interpreting the language of the FTCA.  This interpretation would enable the federal courts to treat the United States as a "private individual under like circumstances." Richards, at 11.   It also would provide a degree of flexibility to the federal courts.  Id. at

12. Also, there is no "persuasive evidence to the contrary" that Congress did not intend the law of the place to include the laws of the Navajo Nation. Id. at 13.

In all reality, if the United States were a private person and thereby § 1346 did not prohibit him from doing so, Mr. Harvey would have brought his claim in a Navajo Nation court. "The Navajo courts have jurisdiction 'over any person doing injury within the Navajo Nation . . . .'" Deal v. Blatchford, 3 Nav. R. 159, 160 (1982); Accord, Keith v. Allred, 3 Nav. R. 191 (Chinle 'Dist Ct. 1981)." Billie v. Abbott, No. A-CV-34-87 (Navajo S. Ct. 11/10/1988) at ¶ 48.

Navajo court jurisdiction is supported by United States Supreme Court and Ninth Circuit case law, see, e.g., Williams v. Lee, 358 U.S. 217, 220 (1959) (Indian tribes have inherent power "to make their own laws and be ruled by them") ; Strate v. A-1 Contractors, 520 U.S. 438, 453 (1997) (Where "tribes possess authority to regulate the activities of nonmembers, '[c]ivil jurisdiction over [disputes arising out of] such activities lies in the tribal courts"); Nevada v. Hicks, 533 U.S. 353, 368 (2001) ("There is little doubt that the tribal court had jurisdiction over such tort claims" in a case involving Navajo plaintiff's claim of injuries suffered as a result of Uranium mining operations by non-Navajo companies); McDonald v. Means, 309 F.3d 530 (9th Cir. 2002) (holding Northern Cheyenne tribal court had jurisdiction over personal injury which occurred on a BIA road on the Northern Cheyenne Reservation); Allstate Indemnity Co. v. Stump, 191 F.3d 1071 (9th Cir. 1999) ("Tribes retain a core sovereign interest in regulating the health and welfare of tribal members" through adjudication of tort claims in tribal court).

There are those who argue that Congress' use of the word "place" in § 1346 is ambiguous and that when Congress wrote "place" it did not mean its ordinary meaning, it

rather meant "state."  However, where Indian Tribes are concerned, any ambiguities in federal law are to be construed generously in order to comport with "traditional notions of sovereignty and with federal policy encouraging tribal independence. "  White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143-44 (1980).

Certainly control over the quality of health care provided to the Navajo people is inexorably intertwined with traditional notions of sovereignty and tribal independence. Consequently, when the word "place" in § 1346 is examined, where Indian Tribes are concerned, it must be construed generously to encompass Indian Reservations such as the Navajo Nation.

Furthermore, traditional notions of sovereignty and tribal independence require consistency of tort recovery for similar injuries which occur within the Navajo Nation. The Navajo Nation is located within the boundaries of three states: Arizona, New Mexico and Utah.  If adjudication of injuries of its people is made pursuant to the laws of three different states depending on where the medical care provided by agents of the United States is received, it would create great potential for inconsistencies and thus uncertainties, the bane of every sovereignty.  Also, such a situation would undermine tribal independence.

The District Court for the District of New Mexico, in Cheromiah v. United States, 55 F. Supp.2d 1259 (D.N.M. 1999), addressed the question of whether "place" in § 1346(b)(1) includes Indian Reservations.  The thoughtful analysis therein follows closely the dictates of the United States Supreme Court in Richards for interpreting the language of the FTCA.

In Cheromiah, a member of the Laguna Tribe brought an FTCA claim against the United States arising out of medical care received at the Acoma Canoncito Laguna Hospital located within the bounds of Acoma tribal land.  The court presented the question generated by § 1346(b)(1) as: "[C]ould a private entity that is, like the United States, non-Indian, be sued and be held liable for medical malpractice under Acoma tribal law?"  Id. at 1302.

After addressing the relevant federal case law, the court concluded that "[I]f the United States were a private person, it could be sued in Acoma Tribal Court for the alleged negligence of its agents."  Id. at 1305.

Similarly, a private person could be sued in Navajo Tribal court for the negligence of its agents that arise within the bounds of the Navajo Nation.  In 1980 the Navajo Tribal Council approved legislation expanding the jurisdiction of the Navajo Tribal courts.  Res. of the Navajo Tribal Council, CF-19-8 (1980).  The resolution makes reference to the need for expanded access to the Navajo legal system stating:

> Many non-Indians reside or do business or conduct other activities within the Navajo Nation (Navajo Indian country) and it is appropriate that these persons be called upon to account for their activities and the effect thereof in the Courts of the Navajo Nation.

Id.  The resolution amended the Navajo jurisdiction statue to "include civil actions in which the defendant is a resident of Navajo Indian country, or has caused an action to occur in Navajo Indian country."  Id.

The Navajo Nation has inherent "authority to protect its members from fraud, deceit, undue influence, overreaching, unconscionable conduct, torts and other kinds of personal conduct the civil law is designed to regulate."  Benally v. John, 4 Nav. R. 39, No. A-CV-27-81 (Navajo Ct. App. 05/05/1983) at ¶ 45.

Furthermore, the Navajo Code, 7 N.T.C. Section 701 provides:

A. The judgment in all civil cases shall be an order of the Court awarding money damages to the injured party, directing the surrender of certain property to the injured party, directing the performance of an act for the benefit of the injured party, directing that a party refrain from taking action with regard to the injured party, or a declaration of rights of the parties.

B. Where the injury was inflicted as the result of negligence, the judgment shall fairly compensate the injured party for his or her injuries or loss.  The Court shall consider the comparative fault of the parties in making an award of damages.

C. Where the injury was inflicted deliberately, intentionally, willfully, wantonly, recklessly, unconscionably, or as the result of gross negligence, the judgment may impose additional penalties in the form of punitive damages in favor of the injured party.  Where punitive damages are awarded, there may be additional award of damages to the Navajo Nation for patterns and practices of conduct in violation of public policy or egregious conduct contrary to clear public policy.

This expression of jurisdiction over acts of non-Indians residing or engaging in on-reservation conduct or conduct having an impact within Navajo Indian country was sanctioned by the United States Supreme Court in Montana v. United States, 450 U.S. 544, 561-67 (1981), which held that Indian tribes may regulate the activities of  non-Indians on tribal trust land.  In 1997 the Supreme Court clarified that this jurisdiction includes both regulatory and adjudicative authority.  Strate v. A-1 Contractors, 520 U.S. 438, 445, 456 (1997).   "[T]ribes retain a core sovereign interest in regulating the health and welfare of tribal members" through adjudication of tort claims in tribal court. McDonald v. Means, 309 F.3d 530 (9th Cir. 2002) (amended opinion); Allstate Indemnity Co. v. Stump, 191 F.3d 1071 (9th Cir. 1999);  Navajo Nation v. Intermoutain Steel Bldgs, Inc., 42 F. Supp.2d 1222 (D. N.M. 1999).

The Montana Court carved out two discrete circumstances in which Indian tribes may regulate non-Indians who reside, or conduct business on fee land, i.e, non-trust land, which is situated within Indian Country.  The first circumstance applies where non-members enter consensual relationships with the tribe or its members.  The second applies to activities that directly affect the tribe's political integrity, economic security, health or welfare.  Montana, 450 U.S. at 565-66.  It should be noted that examination of whether circumstances are present which give the tribe authority, both regulatory and adjudicative, over the activities of non-Indians on fee land within Indian Country, is not relevant to the case at bar because the only land in Navajo Indian country which is not trust land is in the "Checkerboard" area which is located in New Mexico.

Nonetheless, even if the hospital were located on fee land owned by a non-Indian, both exceptions of Montana are met here.  Both circumstances for application of tribal law are present.  The United States entered into a consensual relationship with the Navajo Nation to provide health care to tribal members.  Delivery of medical care has a direct effect on the health and welfare of the tribe.  Montana, 450 U.S. at 556, 565-66.  Cf. analysis in Cheromiah, 55 F. Supp.2d at 1304-05 (reaching the same conclusion with regard to Acoma).  See, also, analysis in  Kerr-McGee Corp. v. Farley, 115 F.3d 1498, 1508 (10th Cir. 1997) (finding tribal jurisdiction over injuries arising out of uranium milling activities on leased tribal land); McDonald v. Means, 309 F.3d 530, 540 (9th Cir. 2002) (finding tribal jurisdiction over tribal land leased to the Bureau of Indian Affairs for a road).  Consequently, even if the Fort Defiance Indian Hospital were on fee land, which it is not, pursuant to Montana, the Navajo Nation would have adjudicatory and

regulatory authority over the health care providers who work at the Fort Defiance Indian Hospital.

Navajo Nation courts are very active.  In 2003 the Navajo courts heard 95,411 cases, including 5,236 civil disputes.  S. Krakoff, A Narrative of Sovereignty: Illuminating the Paradox of the Domestic Dependent Nation, 83 Ore. L. Rev. 1109, 1202 (2004).   In 1969, the Navajo Nation courts began publishing their written decisions, making the law accessible to all litigants appearing therein.  Id. at 1130.  See www.Navajocourts.org for published Navajo Supreme Court decisions.  The Navajo Nation courts deal with torts against its members.  See, e.g.,  Cadman v. Hubbard, 5 Nav. R. 226, 5 Navajo L. Rep. 116 (Crownpoint D. Ct. 1984) (automobile personal injury); Benally v. Mobil Oil Corp., SC-CV-05-01 (Nav. Sup. Ct. November 24, 2003) (personal injury on an oil rig).

The language of Navajo Code, 7 N.T.C. Section 701, quoted supra at 14, is viewed by the Navajo courts as a codification of *nalyeeh* a Navajo common law concept applied by Navajo courts to tort claims.  Cadman v. Hubbard,  5 Nav. R. 226, 5 Navajo L. Rep. 116 (Crownpoint D. Ct. 1984).  See, generally, J.R. Mueller, Restoring Harmony through Nalyeeh:  Can the Navajo Common Law of Torts be Applied in State and Federal Forums? 3 Tribal L. J., 1 (2002-2003);  Robert Yazzie, "Life Comes from It"; Navajo Justice Concepts, 24 N.M. L. Rev. 175 (1994); Daniel L. Lowery, Developing a Tribal Common Law Jurisprudence; the Navajo "Experience, 1969-1992, 18 Am. Indian L. Rev. 379 (1993).  The Navajo Nation Council has also undertaken to incorporate traditional Navajo legal principles in its statutory codification.  See Kenneth Bobroff,

16

Diné Bi Beenahaz'áanii: Codifying Indigenous Consuetudinary Law in the 21st Century, 5 Tribal L.J. (2004/2005).

The instant action is on all fours with Cheromiah. The plaintiff is a member of the Navajo Nation. The medical care at issue was received at the Fort Defiance Indian Hospital which is located within the bounds of the Navajo Nation. Applying Cheromiah requires a conclusion that Navajo tribal law governs the instant FTCA action.

As noted by the court in Cheromiah, there is considerable case law in which the word "place" in § 1346(b)(1) is interpreted to mean "state." The court opined that it was due to the fact that in the past the application of tribal law was rarely, if ever, raised as an issue. Cheromiah, 55 F. Supp.2d at 1306.

Also, courts finding that "place" means "state" rely on cases in which there was a choice between federal law and state law, see, e.g., Federal Deposit Insurance Corp. v. Meyers, 510 U.S. 471 (1994) (addressed issue whether a constitutional tort claim cognizable under § 1346(b)); Hess v. United States, 361 U.S. 314 (1960) (held law of Oregon governed an FTCA action involving a death that occurred within Oregon, but also within the reach of federal admiralty jurisdiction), or where there was conflict between the laws of two states. See, e.g., Brock v. United States, 601 F.2d 976 (9th Cir. 1979) (accident on dam which spanned the Columbia River between Oregon and Washington).

The court in Cheromiah noted that nonetheless, there are well established circumstances in which the "law of the place" does not simply mean the "law of a state." In the District of Columbia, the law of the District is applied in FTCA claims. In Puerto Rico the law of Puerto Rico is applied. In Guam the law of Guam is applied. In the U.S.

Virgin Islands the law of the Virgin Islands is applied.  In the Canal Zone, the law of the

Canal Zone is applied.  See Cheromiah, 55 F.Supp.2d at 1302 and cases cited therein.

None is a state.  Each is rather a "political entity" including territories.  See, Hess v.

United States, 361 U.S. 314, 319, n. 7 (1960) (indicating that "place" means "political

entity.")   It is their law that controls an FTCA claim arising therein, even though they are

not states.

　　　　The United States Supreme Court requires that Indian tribes have the same

footing as other territories in the Union with regard to their laws and proceedings.

Mackey v. Cox, 59 U.S. 100, 15 L.ED. 299, 301 (1855) (emphasis added):

> A question has been suggested whether the Cherokee people should be
> considered or treated as a foreign state or territory.  The fact that they
> are under the constitution of the Union, and subject to Acts of Congress
> regulating trade, is a sufficient answer to that suggestion.  They are not
> only within our jurisdiction, but the faith of the nation is pledged for
> their protection.  In some respects they bear the same relation to the
> federal government as a territory did in its second grade of government,
> under the Ordinance of 1787.  Such territory passed its own laws,
> subject to the approval of Congress, and its inhabitants were subject to
> the Constitution and Acts of Congress.  The principal difference consists
> in fact that the Cherokees enact their own laws, under the restrictions
> stated, appoint their own officers, and pay their own expenses.  This,
> however, is no reason why the laws and proceedings of the Cherokee
> territory, so far as relates to rights claimed under them, should not be
> placed upon the same footing as other territories in the Union.  It is not a
> foreign, but a domestic territory—a territory which originated under the
> Constitution and laws.

　　　　If the territories of Puerto Rico and Guam are treated as the "place" pursuant to §

1346, then the Navajo Nation, as a "domestic territory," should likewise be considered to

be the "place" and its laws should be applied in an FTCA claim arising therein.

　　　　The Eighth Circuit, holding that by "place" Congress meant "state" in § 1346,

stated (emphasis added):

> [T]he choice of law question does not depend on whether a state court or tribal court would have civil authority over an action against private parties.  The identification of the "law of the place" turns on the territorial jurisdiction within which the allegedly tortuous acts or omissions occurred . . . .

LaFromboise v. Leavitt, 439 F.3d 792, 795-6 (8th Cir. 2006).

Following the mandate of LaFromboise would result in finding that the state of Arizona has no "territorial jurisdiction" over the land within the bounds of the Navajo Nation.  The state of Arizona has abrogated all jurisdictions over Indian Country in its Constitution.  The Arizona Constitution provides that the Indian lands within its borders are "subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States."  Arizona Constitution, Article 20, § 4.  A finding that Arizona has no "territorial jurisdiction" over the place where the allegedly tortuous acts or omissions occurred, requires the conclusion, pursuant to LaFromboise, that the state of Arizona cannot be the "place" where the complained of acts or omissions occurred.  Application of LaFromboise requires the conclusion that Navajo tribal law governs the instant FTCA action.

**B.   Arizona Courts would apply Navajo law.**

The District Court for the District of New Mexico in Louis v. United States, 54 F. Supp.2d 1207 (D.N.M. 1999), was confronted with an FTCA case that arose in the Acoma Canoncito Laguna Indian Hospital which is located on the Acoma Reservation within the state of New Mexico.  That court held that "place" in § 1346(b) means "state." Id. at 1210.  However, it went on to hold, citing Richards v. United States, 369 U.S. 1, 9-13, 82 S. Ct. 585, 591-93 (1962), that "a complete reading of the FTCA requires application of the whole law of the state where the act or omission occurred, including

the appropriate conflict of laws doctrine." Id.   Applying New Mexico's choice of law

doctrine, lex loci delicti, the court looked to where the cause of action became complete.

The damages were manifest when the plaintiff died at the Presbyterian Hospital in

Albuquerque.  The court thusly applied New Mexico law.  Id.

    The Fort Defiance Indian Hospital is located in the Navajo Nation where it lies in

the State of Arizona.  The state in which the instant acts or omissions occurred was the

State of Arizona.  Consequently, if the court does not follow Cheromiah, and holds that

when Congress said "place" in § 1346(b) it really meant to say "state," then it would

apply the whole law of the state of Arizona, including its conflict of laws.  Richards v.

United States, 369 U.S. 1, 9-13, 82 S. Ct. 585, 591-93, 7 L.Ed.2d 492 (1962).  Louis v.

United States, 54 F. Supp.2d 1207 (D.N.M. 1999).

    Arizona courts follow the Restatement (Second) of Conflict of Laws (1971)

(Conflict of Laws Restatement) to determine the controlling law.  Bates v. Superior Court

(Nationwide Ins. Co.), 156 Ariz. 46, 48,749 P.2d 1367, 1369 (1988).  Consequently, in

Arizona, cases sounding in tort are resolved under the law of the political entity having

the most significant relationship to both the occurrence and the parties with respect to the

particular issue.  Conflict of Laws Restatement § 145(1).

    Arizona has not opted to recognize territory status for the Navajo Nation as has

New Mexico.  See, Jim v. CIT Services Corporation, 87 N.M. 362, 533 P.2d 751 (1975).

(The Supreme Court of the State of New Mexico acknowledged Navajo Nation's

"territory" status within the meaning of 28 U.S.C. § 1738).  It rather applies the principles

of "comity" and "deference and mutual respect," treating the Navajo Nation as a sister

sovereign.  Brown v. Babbitt Ford Inc., 117 Ariz. 192, 571 P.2d 689, 695, (Ariz. App.

Div. 1 1977).   Arizona courts have fully recognized the validity of Navajo Tribal Court

decisions in the courts of Arizona.  See, e.g., In re Lynch's Estate, 92 Ariz. 354, 377 P.2d

199 (1962) (recognized that a will admitted to probate in the Navajo Tribal Court should

be admitted in state court without further proof under Arizona law); Begay v. Miller, 70

Ariz. 380, 222 P.2d 624 (1950) (Arizona court recognized a Navajo Tribal Court divorce

decree).

The United States Supreme Court in Richards, 369 U.S. at 7, noted that the FTCA

was

> designed to build upon the legal relationships formulated and
> characterized by the States, and to that extent, the statutory scheme is
> exemplary of the general interstitial character of federal law.  If
> Congress had meant to alter or supplant the legal relationships
> developed by the States, it could specifically have done so to further the
> limited objectives of the Tort Claims Act.

The Arizona court in Brown, considered whether it would enforce a Navajo

Nation statute which provided that "personal property of Navajo Indians shall not be

taken from the territorial jurisdiction of the Navajo Nation" unless authorized by Navajo

judicial process or the purchaser's written consent.   In deciding to enforce that statute the

court  was persuaded by the United States Supreme Court's discussion in McClanahan v.

State Tax Commission of Arizona, 411 U.S. 164, 174-175, 93 S. Ct. 1257, 1263, 36

L.ed.2d 129, 137 (1973), which stated, discussing the issue of Navajo Tribal sovereignty

(emphasis added):

> [I]t cannot be doubted that the reservation of certain lands for the exclusive use
> and occupancy of the Navajos and the exclusion of non-Navajos from the
> prescribed area was meant to establish the lands as within the exclusive
> sovereignty of the Navajos under general federal supervision.

The court concluded that since the Arizona courts had recognized the validity of Navajo Tribal Court decisions, then like recognition should be extended to legislative enactments of the Navajo Tribal Council.  Brown, 571 P.2d at 695.

If the United States were a private person, as envisioned by §§  1346(b) (1) & 2674, and Mr. Harvey, a Navajo, brought a tort action in an Arizona court for acts or omissions that occurred on the Navajo Nation as allowed by Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Eng'g P.C., 467 U.S. 138, 148-49 (1984) (holding in general that Indians may sue non-Indians in state court for claims arising within Indian Country), the Arizona court, applying its conflict of law principles, would hold that Navajo tribal law, both common law and statutory, controls.  It would find that the Navajo Nation had "the most significant relationship to both the occurrence and the parties."   Conflict of Laws Restatement § 145(1);  Bates , 156 Ariz. at 48,749 P.2d at 1369;  Brown, 571 P.2d at 695.

Under the facts of this case, the Navajo Nation has the most significant relationship with the occurrence and the parties.  The actions out of which this litigation arose, took place on the Navajo Reservation.  Mr. Harvey is a tribal member with his home located within the Navajo Nation.  The Navajo Nation has a keen interest in regulating the health care provided to its members.   The Navajo Nation contracted with the government to provide medical care for its people.  Maintaining the health of its members has a "'significant impact on the right of the [Navajo Nation] to make [its] own laws and be ruled by them' as it may jeopardize their ability to survive as a people." Cheromiah, 55 F. Supp. 2d at 1305.  See, also, Montana, 450 U.S. 544 ("Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-

Indians on their reservations," including the authority to regulate "the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, [and] contracts . . . ."); Kerr-McGee Corp. v. Farley, 115 F.3d 1498, 1508 (10ᵗʰ Cir. 1997) (tribes retain a core sovereign interest in regulating the health and welfare of tribal members); Iowa Mutual Ins. Co. v. LaPlante, 480 U.S. 9, 18 (1987) ("Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty." )

In comparison, the state of Arizona has no relationship with the parties or the occurrence.   Arizona completely abrogated its jurisdiction and control over tribal lands within its borders in its Constitution.  The Arizona Constitution, ratified in 1912, states in Article 20, § 4 (emphasis added):

> The following ordinance shall be irrevocable without the consent of the United States and the people of this state:
> . . .
> Fourth.  Public lands; Indian lands
> The people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated and ungranted public lands lying within the boundaries thereof and to all lands lying within said boundaries owned or held by any Indian or Indian tribes, the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that, until the title of such Indian or Indian tribes shall have been extinguished, the same shall be, and remain, subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States.

Because the state of Arizona has abrogated its jurisdiction and control over Indian Country within the borders of its state, it has no relationship to this litigation.   That lack of relationship compared to the vital interest of the Navajo Nation with its very survival as a sovereign and a people in the balance, dramatically tips the scales in favor of

applying Navajo Nation law.  Undoubtedly, the Arizona court would apply Navajo law to

the case at bar as should this court.

**C.  If the United States were a "private person" the federal court would require exhaustion of Tribal remedies.**

The FTCA requires that the United States be treated as a private person would be

treated in like circumstance.   28 U.S. C. §§ 1346(b)(1) & 2674.  The relevant question

becomes; What law would be applied if the United States were a private person and Mr.

Harvey brought this claim in federal court?  Navajo Nation v. Intermountain Steel Bldgs.,

Inc., 42 F. Supp.2d 1222 (D.N.M. 1999), provides guidance.   In reaching its decision to

require that the parties exhaust tribal remedies, the court, Id. at 1225-6, stated:

> "Congress is committed to a policy of supporting tribal self-government
> and self-determination."  National Farmers Union Ins. Co. v. Crow Tribe
> of Indians, 471 U.S. 845, 856, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985).
> The development of tribal courts plays an important role in furthering
> the goal of tribal self government.  See Iowa Mutual Ins. Co. v.
> LaPlante, 480 U.S. 9, 14-15, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987).
> "Tribal authority over the activities of non-Indians on reservation lands
> is an important part of tribal sovereignty," and "[c]ivil jurisdiction over
> such activities presumptively lies in the tribal courts unless affirmatively
> limited by a specific treaty provision or federal stature."  Iowa Mutual,
> 480 U.S. at 18, 107 S. Ct. 971.
>
> Based on Congress' commitment to a policy of promotion of tribal self-
> determination, the United States Supreme Court developed the "tribal
> exhaustion rule" in National Farmers, 471 U.S. at 856-57, 105 S.Ct.
> 2447.  This rule "provides that 'as a matter of comity, a federal court
> should not exercise jurisdiction over cases arising under its federal
> question or diversity jurisdiction, if those cases are also subject to tribal
> jurisdiction; until the parties have exhausted their tribal remedies."
> Texaco, Inc. v. Zah, 5 F.3d 1374, 1376 (10th Cir. 1993) (quoting Tillett
> v. Lujuan, 931 F.2d 636, 640 (10th Cir. 1991)); see also National
> Farmers, 471 U.S. at 856-57, 105 S.Ct. 2447; Iowa Mutual, 480 U.S. at
> 15-16, 107 S.Ct. 971.

In enforcing the tribal exhaustion rule, the court in Intermountain Steele, noted

that the "Navajo Nation has a sophisticated judicial system with highly competent judges.

Moreover, the Navajo tribal courts have an adjunct legal institution, the Navajo

Peacemaker Court, that affords an alternative means of dispute resolution which is not

available, in the same form, in the federal court system." Intermountain Steel, 42 F.

Supp.2d at 1229.

In Kerr-McGee Corp. v. Farley, 115 F.3d 1498, 1508 (10th Cir. 1997), cert.

denied, 522 U.S. 1090 (1998), the court of appeals affirmed the district court's ruling

requiring non-Indian defendants to exhaust tribal judicial remedies as to wrongful death

and injury claims arising out of the milling of uranium brought by tribal members in

tribal court:

> We agree that strong tribal interests are implicated by these claims.
> The mill that allegedly produced the toxic and radioactive waste
> was located on the reservation pursuant to a lease with the tribe
> and the alleged victims of the tort are tribal members residing on
> the reservation.  The tribal nexus is strong, as is the interest of the
> tribe as a sovereign in protecting and vindicating the rights of its
> residents, as well as its interest as lessor of the land for the mill.

Id. at 1508.

Here, as in Kerr-McGee, the Navajo Nation has a strong tribal interest in the

quality of medical care provided on the Navajo Nation.  Here, as in McDonald v. Means,

309 F.3d 530 (9th Cir. 2002) (amended opinion),  Kerr-McGee, and Intermountain Steel,

if the defendant were a private person the federal court would dismiss the case so that Mr.

Harvey could pursue tribal remedies.  Inherent in the pursuit of tribal remedies is the

application of tribal law.  Consequently, Mr. Harvey's case would be adjudicated

according to Navajo tribal law.

However, because the FTCA gives the federal court exclusive jurisdiction over

Mr. Harvey's FTCA claim, § 1346(b)(1), this court cannot require that tribal remedies be

exhausted.  <u>Iowa Mutual</u>, 480 U.S. at 18 (exception to the exhaustion rule where "limited

by federal statute").   Nonetheless, the FTCA requires that the United States be held

liable "under circumstances where the United States., if a private person would be liable,"

§ 1346(b)(1), "in the same manner and to the same extent as private individual under like

circumstances." § 1674.

If the United States were a private individual the court would require that this case

be pursued in Navajo tribal court.  <u>Intermountain Steel</u>, 42 F. Supp.2d at 1225-6.  The

closest that this court can get to treating the United States as a private individual is to

apply the law which would be applied if the United States were a private individual, i.e.,

Navajo Law.  Indeed, the only way that the United States can be liable in the same way as

a private person would be liable is for this court to apply Navajo tribal law to Mr.

Harvey's claim.

### III. CONCLUSION

For the foregoing reasons, Plaintiff prays that the court grant his motion and hold

that the laws of the Navajo Nation govern this case

Respectfully submitted this 3rd  day of October, 2008.

_____           _____
Mickale Carter                            Burt Broxterman
1211 Winchester St                        2539 Wyoming NE Suite A
Fredericksburg VA 22401                   Albuquerque NM  87112
505 270 1480                              505 296 4821
                                          Fax:  505 296 4822
Counsel for Plaintiff                     Counsel for Plaintiff