# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**FRANCIS LEON HARVEY**,

>          Plaintiff,

>   vs.                                                 No. 08CV107 MCA/RLP

**UNITED STATES OF AMERICA,**

>          Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Plaintiff's Motion for Partial Summary Judgment* [Doc. 17], filed October 6, 2008.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion.

## I. BACKGROUND

Plaintiff Francis Leon Harvey is an enrolled member of the Navajo Tribe who resides on that portion of the  Navajo Reservation located in the State of New Mexico.  The Fort Defiance Indian Hospital ("FDIH") is located on the Navajo Reservation, in the State of Arizona.  Indian Health Services ("IHS"), an agency of the United States Government, operates FDIH pursuant to a lease with the Navajo Nation. [See Doc. 18 at 2].

In early February of 2004, Mr. Harvey fell on ice, hurting his right hand, right leg, and right rib area.  On February 6, 2004, he presented at the walk-in clinic of FDIH, at which time health care providers gave him Motrin for the pain he was experiencing, and advised him to return in one month if his condition did not improve.  It is undisputed that a note in

Mr. Harvey's medical record states, "X-rays all ok," even though the radiology department's report on the X-ray of his right hand noted a fracture of the base of the fifth metacarpal. [Doc. 1 at 2-3; Doc. 6 at 3; Doc. 54; Exhs. A, B].

Mr. Harvey returned to FDIH on March 5, 2004, continuing to complain of pain. A note made that day again stated that "X-rays were ok," and Mr. Harvey was provided more Motrin. [Doc. 1 at 3; Doc. 6 at 3].

On March 29, 2004, Mr. Harvey went back to FDIH and was X-rayed once more. Among other notations, the medical record from that visit states "[r]ight fifth metacarpal (digit) base fracture 2/6/04." [Doc. 54, Exh. E]. Additionally, Mr. Harvey "was told he needs to see ortho ASAP." [Id.; Exh. E].

On March 30, 2004, Mr. Harvey visited the FDIH's orthopedic clinic, where he was provided with a splint and directed to "use [it] part time for comfort." [Doc. 54; Exh. F]. He also was instructed to return to the clinic in two weeks. [Doc. 54; Exh. F].

When Mr. Harvey returned to the orthopedic clinic on April 20, 2004, it was recommended that he undergo surgery. [Doc. 1 at 3; doc. 6 at 3]. Accordingly, Mr. Harvey went back to the orthopedic clinic on May 3, 2004 for a pre-op appointment and, on May 5, 2004, underwent hand surgery performed by Dr. Victor Brown. [Doc. 1 at 3-4; Doc. 6 at 3-4; Doc. 54, Exh. H. Notations in the medical record from May 3, 2004 reveal that both the surgery and "all adverse reactions" were discussed with Mr. Harvey. [Doc. 54, Exh. H]. Similarly, the consent form that Mr. Harvey signed that same day notes that "[c]ommon and important risks associated with the proposed operation . . . include infection, neural vascular

trauma, non-union, [and] arthritis." [Id.; Exh. I].

Mr. Harvey returned to the orthopedic clinic on May 10, 2004 for a follow-up appointment, and again on May 13, 2004 because his hand was hurting him. An X-ray revealed that the hand was not infected and was healing. Mr. Harvey's stitches were removed at that time, his hand was recast, and he was instructed to return to the clinic in four weeks for cast removal and X-ray. [Doc. 1 at 4; Doc. 6 at 4].

On June 10, 2004, Mr. Harvey returned to the clinic to report that his hand was swollen and turning yellow. [Doc. 1 at 4; Doc. 6 at 4]. Mr. Harvey returned to the orthopedic clinic again on June 16, 2004. Notes from the medical record of that day explain that Mr. Harvey's "hand [was] swelling up[,]" but also that it was "healing well." [Doc. 1 at 4; Doc. 65; Exh. P]. According to Mr. Harvey, he was informed during the June 16, 2004 visit "that it would take a year for his hand to get back to normal." [Doc. 1 at 4].

Again on March 21, 2005, Mr. Harvey returned to the FDIH orthopedic clinic, complaining of pain. [Doc. 4 at 4]. An examination of his right hand revealed ulnar nerve entrapment, and medical-record notes from the visit show that Mr. Harvey was instructed to wear a wrist support and to go to physical/occupational therapy. [Doc. 65, Exh. Q]. According to Mr. Harvey, he was again told "that it would take yet another year for his hand to get back to normal." [Doc. 1 at 5].

By April of 2006, Mr. Harvey did not believe that his hand was "right." [Doc. 1 at 5]. Accordingly, on May 1, 2006, he filed an administrative claim (Form 95 *Claim for Damage, Injury, or Death*) with the Department of Health and Human Services, in which he described

the basis of the claim as a "[f]ailure to diagnose broken bone in right hand. Surgery to repair fell below the standard of care." In the box marked "Date and Day of Accident" Mr. Harvey wrote "May 2004." Mr. Harvey sought personal-injury damages in the amount of $300,000. [Doc. 54, Exh. K].

By letter dated July 10, 2006, counsel for Mr. Harvey advised that Mr. Harvey was amending the amount of his claim from $300,000 to $2,016,120. [Doc. 54, Exh. N].  The greater amount apparently is what Mr. Harvey believes is necessary to effect *nalyeeh*, which, under Navajo law, is a demand by a victim to be made whole for an injury. [Doc. 1 at 2].  By letter dated June 20, 2007 and received by counsel for Mr. Harvey on July 16, 2007, the administrative claim was denied as untimely. [Id., Exh. O at 1].  On January 29, 2008, Mr. Harvey filed his *FTCA Medical Malpractice Complaint*, alleging that providers at FDIH breached the applicable standard of care.  [Doc. 1 at 6].

On October 6, 2008, Mr. Harvey filed *Plaintiff's Motion for Partial Summary Judgment* [Doc. 17].  In his motion, Mr. Harvey asks the Court to determine that the applicable law in this Federal Tort Claims Act ("FTCA") action is the tort law of the Navajo Nation, because the Navajo Nation is the "place" where the triggering act or omission occurred. [Doc. 18 at 8-18].  Alternatively, Mr. Harvey argues that, should the Court interpret "place" to mean "State," then the laws of the State of Arizona, including its conflict-of-laws provisions, apply, and similarly mandate that the law of the Navajo Nation control. [Id. at 19-24].  The United States responds that for purposes of the FTCA, courts have consistently interpreted "place" as meaning "State"; and that therefore, in this case, the applicable law is

that of the State of Arizona. [See generally Doc. 24].

Following the filing of Mr. Harvey's motion for partial summary judgment, the United States filed *Defendant's Motion to Dismiss Certain Claims Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(h)(3)* [Doc. 53] on the ground that all claims of negligence preceding May 1, 2004 (the date two years prior to the filing of Mr. Harvey's administrative claim) must be dismissed as time-barred. [Doc. 54 at 1-2].  The Court addresses herein only the motion for partial summary judgment.

## II. ANALYSIS

### A.     *Plaintiff's Motion for Partial Summary Judgment* [Doc. 17]

#### 1.      Standard of Review: Fed.R.Civ.P. 56

The Court may enter summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 796 (10th Cir.1995) (quoting Fed.R.Civ.P. 56©).  A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986). An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim.  See id. at 248.

When, as here, the movant is also the party bearing the burden of persuasion with regard to the claim on which a summary judgment is sought, the movant must show that the

record as a whole satisfies each essential element of its case and negates any affirmative defenses in such a way that no rational trier of fact could find for the non-moving party.  <u>See 19 Solid Waste Dep't Mechanics v. City of Albuquerque</u>, 156 F.3d 1068, 1071 (10th Cir. 1998); <u>Newell v. Oxford Mgmt., Inc.</u>, 912 F.2d 793, 795 (5th Cir. 1990); <u>United Missouri Bank of Kansas City, N.A. v. Gagel</u>, 815 F. Supp. 387, 391 (D.Kan. 1993).  The admissions in a party's answer to a complaint are binding for purposes of determining whether the movant has made such a showing.  <u>See Missouri Housing Dev. Comm'n v. Brice</u>, 919 F.2d 1306, 1314-15 (8th Cir. 1990).  Similarly, the Court may consider any undisputed material facts set forth in the motion papers which are deemed admitted by operation of D.N.M. LR-Civ.56.1.  <u>See LaMure v. Mut. Life Ins. Co. of N.Y.</u>, 106 F.3d 413, 1997 WL 10961, at *1 (10th Cir. 1997) (unpublished disposition); <u>Smith v. E.N.M. Med. Ctr.</u>, 72 F.3d 138, 1995 WL 749712, at *4 (10th Cir. 1995) (unpublished disposition); <u>Waldridge v. American Hoechst Corp.</u>, 24 F.3d 918, 920-24 (7th Cir.1994) (approving use of local rule similar to D.N.M. LR-Civ. 56.1(b)).

Apart from these limitations, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the admissible evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all admissible evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  <u>See Hunt v. Cromartie</u>, 526 U.S. 541, 551-52 (1999).

**2.    The Federal Tort Claims Act**

Under the doctrine of sovereign immunity, "'the United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" <u>Weaver v. United States</u>, 98 F.3d 518, 520 (10th Cir.1996) (*quoting* <u>United States v. Sherwood</u>, 312 U.S. 584, 586 (1941)).  The threshold question in any suit in which the United States is a defendant, then, must be whether Congress has specifically waived sovereign immunity, and a plaintiff's recovery is limited by the express terms of the United States' waiver.  <u>Louis v. United States</u>, 54 F.Supp.2d 1207, 1209 (D.N.M. 1999).

In this case, the FTCA sets the parameters of the United States' liability.  Pursuant to the FTCA, the United States is made liable (within the scope of its waiver of sovereign immunity)

> for personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with *the law of the place* where the act or omission occurred.

28 U.S.C. § 1346(b)(1) (emphasis added).  It is the meaning of the phrase "the law of the place" that is in dispute here, with Mr. Harvey insisting that "place" means the Navajo Nation and the United States urging the Court to conclude that "place" means the State of Arizona. [<u>See</u> Doc. 18 at 10-19; Doc. 24 at 6-9].

Mr. Harvey puts heavy reliance on Cheromiah v. United States, 55 F.Supp.2d 1295 (D.N.M. 1999), and asks this Court to do the same, concluding, simply (though after extensive analysis) that "Cheromiah got it right." [Doc. 25 at 6]. Cheromiah was, among other things, an FTCA action brought by parents whose adult son died as a result of a bacterial infection that went both undiagnosed and untreated after four visits in five days to the emergency room of the Acoma Canoncito Laguna Hospital ("ACLH"). Id. at 1297. ACLH is located in the State of New Mexico, within the boundaries of Acoma tribal land, and is operated by IHS pursuant to a lease with the Acoma tribe. Id. Plaintiffs/parents sought partial summary judgment that the New Mexico Medical Malpractice Cap did not apply because the controlling law was the law of the Acoma tribe, *not* the law of the State of New Mexico. Id.

Notwithstanding that the district court found a "compelling logic" in parents' argument that, for purposes of 28 U.S.C. § 1346(b)(1), "the law of the place" was the law of the Acoma tribe because the alleged medical malpractice occurred with the boundaries of tribal lands, the court still carefully scrutinized (1) United States Supreme Court and federal district court interpretations of the phrase "the law of the place;" (2) legal principles authorizing tribal jurisdiction to be asserted over non-Indians; and (3) notions of tribal sovereignty. Cheromiah, 55 F.Supp.2d at 1301-08. This Court recognizes that the Cheromiah court's analysis is sound and proceeds in its own analysis in a like manner.

The meaning of the phrase "the law of the place" was considered in Hess v. United States, where the question presented was what law applied in an FTCA wrongful-death

action where death occurred on navigable waters within the territorial limits of the State of

Oregon.  Hess v. United States, 361 U.S. 314, 315 (1960).  In Hess, the United States

Supreme Court determined that because the "death and the wrongful act or omission which

allegedly caused it occurred within the State of Oregon . . . liability must therefore be

determined in accordance with the law of that place."  Id. at 318.  The Court further noted

that, because the death occurred on navigable waters, Oregon law would require the

determining court to look to maritime law.  See id.

    In rejecting the argument that death actually occurred on the dam on which the

decedent had been working and, therefore, the applicable law was the law governing torts

occurring on land, the Court explained:

> It is clear . . . that the term 'place' in the Federal Tort Claims
> Act means *the political entity*, in this case Oregon, whose laws
> shall govern the action against the United States 'in the same
> manner and to the same extent as a private individual under like
> circumstances.'  There can be no question but that Oregon
> would be required to apply maritime law if this were an action
> between private parties, since a tort action for injury or death
> occurring upon navigable waters is within the exclusive reach of
> maritime law.

Hess, 361 U.S. at 318 n.7 (emphasis added; internal citation omitted).  This Court does not

construe Hess as concluding, as many other courts have, that, for purposes of the FTCA, "the

law of the place" necessarily means the law of the State.  See, e.g., LaFromboise v. Leavitt,

439 F.3d 792, 794 (8th Cir. 2006) ("[T]he most apposite precedents from the federal

appellate courts support the view that 'place' means 'State.'") (and collecting cases); Federal

Express Corp. v. United States, 228 F.Supp.2d 1267, 1269 (D.N.M. 2002) ("Plaintiffs ignore

the overwhelming load of case law that has interpreted the term 'law of the place' to refer to the substantive law of the state in which the tort occurred.") (and collecting cases).  To the contrary, the Court in <u>Hess</u> was quite explicit that "[i]t is clear . . . that the term 'place' in the [FTCA] *means the political entity*. . . ."  <u>Id.</u> (emphasis added).   It just so happened in the facts presented in <u>Hess,</u> the political entity was the State of Oregon.

Notwithstanding the <u>Hess</u> Court's equating "place" (as used in the FTCA) with "political entity," the United States in the instant action asserts that "[t]he Supreme Court has recognized and never questioned the assumption that the singular Law of the Place, is that of the State." [Doc. 24 at 5-6].  It is true that the Supreme Court has stated that it "ha[s] consistently held that § 1346(b)'s reference to the 'law of the place' means law of the State—the source of substantive liability under the FTCA." <u>F.D.I.C. v. Meyer</u>, 510 U.S. 471, 478 (1994).  However, in neither <u>Meyer</u> nor any of the four cases[1] on which the <u>Meyer</u> Court relied for this assertion was the Court faced with the precise circumstance that presents itself here and that also arose in <u>Cheromiah</u>—determining "the law of the place" when the act or omission occurs in a location that implicates a political entity (*i.e.*, an Indian tribe)[2] within

---

[1]  Those four cases are (1) <u>Miree v. DeKalb County, Ga.</u>, 433 U.S. 25 (1977) (breach-of-contract action brought in diversity and arising out of crash of passenger jet); (2) <u>United States v. Muniz</u>, 374 U.S. 150 (1963) (FTCA action brought by inmates who sustained personal injuries while incarcerated); (3) <u>Richards v. United States</u>, 369 U.S. 1 (1962) (FTCA action arising out of airline crash in Missouri and implicating laws of Missouri and Oklahoma); and (4) <u>Rayonier Inc. v. United States</u>, 352 U.S. 315 (1957) (FTCA action arising from forest fire on government land).

[2]  Indian tribes are recognized as political entities.  As the Ninth Circuit has explained:

> "Indian tribes have been recognized, first by the European nations,
> later by the United States, 'as distinct, independent political

10

a political entity (*i.e.*, a State).  See Hess, 361 U.S. at 318 n.7 ("It is clear . . . that the term 'place' in the [FTCA] *means the political entity*. . . .").

     To be sure, a number of federal courts have "assumed without discussion . . . that, in cases that arise on an Indian reservation within a State, the substantive law of the State is controlling. . . ." Louis v. United States, 54 F.Supp.2d 1207, 1209 (D.N.M. 1999); see also Red Elk on Behalf of Red Elk v. United States, 62 F.3d 1102, 1104-05) (8th Cir. 1995) (South Dakota law determined whether tribal police officer was acting within course and scope of employment when he raped teenaged girl); Red Lake Band of Chippewa Indians v. United States, 936 F.2d 1320, 1325 (Minnesota law applied in FTCA action arising from property damage ion reservation); Seyler v. United States, 832 F.2d 120, 121 (9th Cir. 1987) (Idaho law applied in FTCA action arising from personal injuries sustained as result of motorcycle accident on reservation road); Big Head v. United States, 166 F.Supp. 510, 513 (D.Mont. 1958) (Montana law applied in FTCA action for damages incurred when truck overturned on reservation road).

---

communities' qualified to exercise powers of self-government, not by virtue of any delegation of powers, but rather by reason of their original tribal sovereignty." F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 232 (1982 ed.) (*quoting* Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 519, 8 L.Ed. 483 (1832)). Tribal sovereignty is of "a unique and limited character." United States v. Wheeler, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978). The incorporation of tribes within the territory of the United States means that tribal sovereignty "exists only at the sufferance of Congress and is subject to complete defeasance." Id. However, "until Congress acts, the tribes retain their sovereign powers." Id.

State of Montana v. Gilham, 133 F.3d 1133, 1135-36 (9th Cir. 1998).

However, as the Cheromiah court noted, in none of these foregoing cases was application of tribal law actually raised as an issue. Cheromiah, 55 F.Supp.2d at 1306 ("The fact that [application of tribal law] has never been done, standing alone, does not mean that it is not what the law requires."). That this is so is significant because "questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." Webster v. Fall, 266 U.S. 507, 511 (1924); accord Superintendent Five Civilized Tribes, for Sandy Fox, Creek No. 1263 v. C. I. R., 75 F.2d 183, 184 n.2 (10th Cir. 1935).

Thus, it was the "assum[ption] without discussion[,]" noted by the court in Louis, that caused the United States District Court for the Southern District of California, in Quechan Indian Tribe v. United States, to reject as non-precedential those cases in which courts assumed without deciding that State law— rather than tribal law—was "the law of the place" and, instead, follow what it deemed the persuasive reasoning of Cheromiah. Quechan Indian Tribe v. United States, 535 F.Supp.2d 1072, 1103 (S.D.Cal. 2008).

In Quechan, the Quechan Indian Tribe ("the Tribe") brought an FTCA action against the United States to recover for property damage sustained by certain tribal cultural sites as a result of the United States' work in repositioning and maintaining electrical transmission pole lines. Among other things, the Tribe charged the United States with negligence, gross negligence, negligence per se, and public and private nuisance. The United States moved for partial summary judgment on the ground that California law applied, but that the Tribe was relying on state-law causes of action that were not actionable against a private person.

12

Quechan Indian Tribe, 535 F.Supp.2d at 1101.  Although the Quechan court ultimately determined it was required to look only to California law in support of the Tribe's claims, its analysis is instructive and informs that of this Court.

In addressing the issue before it, the Court in Quechan undertook a thorough evaluation of Cheromiah and its reasoning, explaining why it found Cheromiah more persuasive than two FTCA cases decided by courts in the District of Arizona.  After first considering the Cheromiah court's conclusion that, for FTCA purposes "the law of the place" was the law of the Acoma Tribe, the Quechan court noted that "[t]here [was] no controlling authority on the issue of whether 'law of the place' include[d] tribal law when the act or omission occurred within the boundaries of an Indian reservation."  Quechan Indian Tribe, 535 F.Supp.2d at 1101-02.  Recognizing that "[t]he Ninth Circuit ha[d] applied state law to tort actions occurring within reservation boundaries without discussion[,]" the Quechan court proceeded to emphasize that "'[s]uch unstated assumptions on non-litigated issues are not precedential holdings binding future decisions.'"  Id. (quoting Sakamoto v. Duty Free Shoppers, Ltd., 764 F.2d 1285, 1288 (9th Cir.1985)).  For that reason, the Quechan court went ahead and "examined authority in other jurisdictions to determine the appropriateness of applying tribal law in [the] FTCA action[]" before it.  Quechan Indian Tribe, 535 F.Supp.2d at 1102.

The Quechan court's examination began with two District of Arizona cases that involved (1) the commission of dental malpractice in an IHS hospital located on the Navajo

reservation in Shiprock, New Mexico;[3] and (2) a fatal car accident that occurred within the geographical boundaries of the Navajo Nation.[4]  The courts in both cases considered—but rejected as non-persuasive—the Cheromiah court's reasoning, explaining that a more convincing line of cases holds that when a negligent act or omission occurs on a federal enclave within a state, it is the state's law—and not tribal law—that applies.  See Ben v. United States, 2007 WL 1461626, at *3 (D.Ariz. May16, 2007); Bryant ex rel. Bryant v. United States, 147 F.Supp.2d 953, 957-958 (D.Ariz. 2000).  Both Ben and Bryant relied on Brock v. United States, in which the Ninth Circuit held that "the law of the place" means "the law of the state in which the negligence occurred[, and that] place referr[ed] to locality rather than jurisdiction. . . ."  Brock v. United States, 601 F.2d 976, 978, 979 (9th Cir. 1979).

The Quechan court articulated three reasons for declining to rely on Ben and Bryant. First,  the court "f[ound] reliance on Brock in the context of Indian law issues inappropriate, because Brock does not deal with the unique nature of Indian law and jurisdiction or Indian sovereignty."  Quechan Indian Tribe, 535 F.Supp.2d at 1102.  Second, the court took issue with Ben and Bryant to the extent they relied on cases that applied state law to acts occurring on Indian land without discussing applicable Indian law.  And finally, the court opted not to follow district-court cases that themselves relied upon cases in which the relevant actions did not occur on the reservation.  Id. at 1102-03.

---

[3]  Bryant ex rel. Bryant v. United States, 147 F.Supp.2d 953 (D.Ariz. 2000).

[4]  Ben v. United States, 2007 WL 1461626 (D.Ariz. May 16, 2007).

14

Instead, the Quechan court agreed with the Cheromiah court's interpretation of the plain language of the statute and concluded that "the phrase 'the law of the place' can only be interpreted to mean the law of a recognizable entity having jurisdiction over the site where the act occurred, which is not necessarily the 'law of the state.'" Quechan Indian Tribe, 535 F.Supp.2d at 1103. Such an interpretation is consistent with the Tenth Circuit's determination that "a tribe, even though physically located within the geographic boundaries of a state, is . . . a sovereign." United States v. Barquin, 799 F.2d 619, 621 (10th Cir. 1986). Having so interpreted "the law of the place," the next question for the Quechan court, as it had been for the Cheromiah court, was whether a private person would be liable under tribal law for the acts alleged; if so, determined the court, Quechan law would apply. Id.

The question of when a private person is liable under tribal law was addressed by the United States Supreme Court first in Montana v. United States, 450 U.S. 544 (1981), and more recently in Strate v. A-1 Contractors, 520 U.S. 438 (1997). In Montana, the Supreme Court held that the Crow Tribe of Montana was without power to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers of the Tribe. Montana, 450 U.S. at 565. However, citing Indian tribes' "inherent sovereign power" to exercise certain forms of civil jurisdiction over non-Indians on reservations, the Court explained that

> [a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political

15

> integrity, the economic security, or the health or welfare of the
> tribe.

Id. at 565-566 (internal citations omitted).

In Strate, the Court further clarified that Montana

> described a general rule that, absent a different congressional
> direction, Indian tribes lack civil authority over the conduct of
> nonmembers on non-Indian land within a reservation, subject to
> two exceptions: The first exception relates to nonmembers who
> enter consensual relationships with the tribe or its members; the
> second concerns activity that directly affects the tribe's political
> integrity, economic security, health, or welfare.

Strate, 520 U.S. at 446.  Strate involved an automobile accident between two non-Indians on

a public highway maintained by the State of North Dakota pursuant to a federally granted

right-of-way over Indian reservation land.  In concluding that neither Montana exception

applied, the Court explained that the first exception was inapplicable because the activity in

question did not involve "consensual relationships" entered into by the tribe in question (or

its members) and nonmembers.  With respect to the second exception, the Court first

recognized that "[u]ndoubtedly, those who drive carelessly on a public highway running

through a reservation endanger all in the vicinity, and surely jeopardize the safety of tribal

members."  Id. at 457-458.  The Court went on to explain, however, that "if Montana's

second exception require[d] no more, the exception would severely shrink the rule" because

the true triggering factor for the second exception is a tribe's "need[] to preserve 'the right

of reservation Indians to make their own laws and be ruled by them.'" Id. at 459 (*quoting*

Williams v. Lee, 358 U.S. 217, 220 (1959)).  The Court concluded that this need did not exist

in the case of a state highway accident involving non-Indians.  Strate, 520 U.S.  at 459.

The situation is entirely different, however, where the alleged negligence occurs in a health-care facility that is located on the reservation and operated by a federal agency (IHS) pursuant to an agreement with the tribe on whose land the facility sits.  This was a finding of the court in Cheromiah, and it is a finding of this Court as well.  In such a situation, the United States clearly is engaged in "activity that directly affects the tribe's political integrity, economic security, *health, or welfare*."  Strate, 520 U.S. at 446 (emphasis added).  To be sure, the United States shares a special trust relationship[5] with Native Americans that is reflected in, among other things, the United States' obligation to provide Indians with high-quality health care.  The Ninth Circuit commented on this obligation when it said the following about the Indian Health Care Improvement Act, 25 U.S.C. § 1601 *et seq.* ("IHCIA"):

> Reviewing the text of the IHCIA and the relevant legislative history, one is struck by Congress' recognition of federal responsibility for Indian health care. In the language of the IHCIA itself, Congress declares that in order to fulfill its "special responsibilities and legal obligation to the American Indian people," the nation's policy is "to meet the national goal of providing the highest possible health status to Indians and to provide existing Indian health services with all resources necessary to effect that policy."

McNabb for McNabb v. Bowen, 829 F.2d 787, 792 (9th Cir. 1987) (*quoting* 25 U.S.C. § 1602)).  Indeed, Congress has specifically found that "[f]ederal health services to maintain

---

[5]  This Court has previously considered the nature of the special trust relationship existing between the United States and Native Americans.  See Tsosie ex rel. Estate of Tsosie v. United States, 441 F.Supp.2d 1100 (D.N.M. 2004).

and improve the health of the Indians are consonant with and required by the Federal Government's historical and unique legal relationship with, and resulting responsibility to, the American Indian people."  25 U.S.C.A. § 1601(a).  Thus, when the United States, pursuant to the special trust relationship, undertakes to provide medical care for the native population *and* provides that care in a negligent manner, the United States unquestionably engages in activity that directly affects the tribe's health and welfare.  See Strate, 520 U.S. at 446.  Accordingly, the Court determines that the instant situation is one that comes within the second exception set forth in Montana.

Because the facts of the instant situation fall within Montana's second exception to the general rule that tribal jurisdiction does not exist over the conduct of nonmembers, the Court concludes that, if the United States were a private person, it would be amenable to a personal-injury lawsuit in a court of the Navajo Nation.  See 28 U.S.C. § 1346(b)(1).  Because, in the instant situation, "the United States, if a private person, would be liable to [Mr. Harvey] in accordance with the law of the place where the act or omission occurred[,]" id., it follows that the applicable law is the law of the Navajo Nation.

Application of tribal law in the circumstances of this case is appropriate.  As the United States Supreme Court has explained,

> Indian tribes occupy a unique status under our law.  At one time they exercised virtually unlimited power over their own members as well as those who were permitted to join their communities. Today, however, the power of the Federal Government over the Indian tribes is plenary. Federal law, implemented by statute, by treaty, by administrative regulations, and by judicial decisions, provides significant protection for the individual, territorial, and political rights of the Indian tribes.

18

The tribes also retain some of the inherent powers of the self-governing political communities that were formed long before Europeans first settled in North America.

Nat'l Farmers Union Ins. Companies v. Crow Tribe of Indians, 471 U.S. 845, 851 (1985). Notwithstanding the federal government's "plenary" power, however, "a tribe is a sovereign entity. . . ." Barquin, 799 F.2d at 621; see also Kerr-McGee Corp. v. Farley, 915 F.Supp. 273, 276 (D.N.M. 1995) ("Indian tribes and the federal government are dual sovereigns."). The Supreme Court long ago discussed the unique relationship shared by the United States and the tribes in the context of determining whether the Cherokee Nation is a "foreign state" within the meaning of the United States Constitution.  Answering the question in the negative, the Court explained that "[t]he condition of the Indians in relation to the United States is perhaps unlike that of any other two people in existence[, as] the relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist no where else." Cherokee Nation v. State of Ga., 30 U.S. 1, 16 (1831).  That Indian tribes retain attributes of sovereignty over both their members and their territory is reflected in the federal government's longstanding policy of encouraging tribal self-government. Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 14 (1987) (internal citations omitted).  It is this tribal self-government that, in turn, helps fuel a federal-tribal comity "aris[ing] out of mutual respect between sovereigns." Smith v. Moffett, 947 F.2d 442, 445 (10th Cir. 1991).  Finally, the Court takes judicial notice of the Navajo Nation Code, which is available on Westlaw, and particularly 7 N.T.C. § 701, which  is viewed by the Navajo courts as a codification of *nalyeeh*, a Navajo common law concept applied by Navajo courts to tort claims.  See, e.g.,

ROBERT YAZZIE, "LIFE COMES FROM IT": NAVAJO JUSTICE CONCEPTS, 24 N.M. L. Rev. 175, 184-185  (1994).

It is on the basis of the foregoing that this Court will grant *Plaintiff's Motion for Partial Summary Judgment.*

## III. CONCLUSION

For the reasons stated more fully herein, the Court concludes that, for purposes of the FTCA, "the law of the place" in this matter is the law of the Navajo Nation.  Accordingly, the Court will grant Francis Harvey's motion for partial summary judgment.

**IT IS, THEREFORE, ORDERED** that *Plaintiff's Motion for Partial Summary Judgment* [Doc. 17] is **GRANTED**.

**SO ORDERED** this 29th day of September, 2009, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge