IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**FRANCIS LEON HARVEY**,

    Plaintiff,

vs.                                         No. 08CV107 MCA/RLP

**UNITED STATES OF AMERICA,**

    Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on *Defendant's Motion to Dismiss Certain Claims Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(h)(3)* [Doc. 53], filed June 12, 2009. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion.

**I. BACKGROUND**

The following facts and well-pleaded allegations are set forth in the *Complaint* and, for purposes of Defendant's motion to dismiss, are accepted as true and construed in a light most favorable to Plaintiff. See Williams v. Meese, 926 F.2d 994, 997 (10th Cir. 1991).

Plaintiff Francis Leon Harvey is an enrolled member of the Navajo Tribe who resides on that portion of the Navajo Reservation located in the State of New Mexico. The Fort Defiance Indian Hospital ("FDIH") is located on the Navajo Reservation, in the State of Arizona. Indian Health Services ("IHS"), an agency of the United States Government,

operates FDIH.

In early February of 2004, Mr. Harvey fell on ice, hurting his right hand, right leg, and right rib area. On February 6, 2004, he presented at the walk-in clinic of the FDIH, at which time health care providers gave him Motrin and an ice pack for the pain he was experiencing, and advised him to return in one month if his condition did not improve. A note in Mr. Harvey's medical record states, "X-rays all ok," even though a radiology department report on the X-ray of his right hand stated that there was a fracture of the base of the fifth metacarpal. [Doc. 1 at 2-3; Doc. 6 at 3].

Mr. Harvey returned to the FDIH on March 5, 2004, continuing to complain of pain. A note made that day again stated that "X-rays were ok," and Mr. Harvey was provided more pain medication. [Doc. 1 at 3].

On March 29, 2004, Mr. Harvey went back to the FDIH and was X-rayed once more. A radiology department report on this X-ray stated that there was a fracture at the base of Mr. Harvey's fifth metacarpal. Mr. Harvey was then instructed to go to the hospital's orthopedic clinic "ASAP." [Doc. 1 at 3].

On March 30, 2004, Mr. Harvey visited the FDIH's orthopedic clinic, where he was provided with a splint to use for comfort. [Doc. 1 at 3]. He also was instructed to return to the clinic in two weeks. [Id.].

When Mr. Harvey returned to the orthopedic clinic on April 20, 2004, it was recommended that he undergo surgery. [Doc. 1 at 3]. Accordingly, Mr. Harvey went back to the orthopedic clinic on May 3, 2004 for a pre-op appointment and, on May 5, 2004,

underwent hand surgery performed by Dr. Victor Brown. [Id. at 3-4]. Notations in the medical record from May 3, 2004 reveal that both the surgery and "all adverse reactions" were discussed with Mr. Harvey, and also that all of Mr. Harvey's questions were explained and answered to his satisfaction. [Doc. 54, Exh. H]. Similarly, the consent form that Mr. Harvey signed that same day notes that "[c]ommon and important risks associated with the proposed operation . . . include infection, neural vascular trauma, non-union, [and] arthritis." [Id.; Exh. I].

Mr. Harvey returned to the orthopedic clinic on May 10, 2004 for a follow-up appointment, and again on May 13, 2004 because his hand was hurting him. An X-ray revealed that the hand was not infected and was healing. Mr. Harvey's stitches were removed at that time, his hand was recasted, and he was instructed to return to the clinic in four weeks for cast removal and X-ray. [Doc. 1 at 4; Doc. 6 at 4].

On June 10, 2004, Mr. Harvey returned to the clinic to report that his hand was painful, swollen, and turning yellow. [Doc. 1 at 4]. Mr. Harvey returned to the orthopedic clinic again on June 16, 2004. He was told that his hand was healing, but that it would take a year for the hand to return to normal [Doc. 1 at 4].

Again on March 21, 2005, Mr. Harvey returned to the FDIH orthopedic clinic, complaining of pain. [Doc. 1 at 4]. An examination of his right hand revealed ulnar nerve entrapment, and medical-record notes from the visit show that Mr. Harvey was instructed to wear a wrist support and to go to physical/occupational therapy. [Id.]. According to Mr. Harvey, he was again told "that it would take yet another year for his hand to get back to

normal." [Doc. 1 at 5].

By April of 2006, Mr. Harvey did not believe that his hand was "right." [Doc. 1 at 5]. Accordingly, on May 1, 2006, he filed an administrative claim (Form 95 *Claim for Damage, Injury, or Death*) with the Department of Health and Human Services, in which he described the basis of the claim as a "[f]ailure to diagnose broken bone in right hand. Surgery to repair fell below the standard of care." In the box marked "Date and Day of Accident" Mr. Harvey wrote "May 2004." Mr. Harvey sought personal-injury damages in the amount of $300,000. [Doc. 54, Exh. K].

By letter dated July 10, 2006, counsel for Mr. Harvey advised that Mr. Harvey was amending the amount of his claim from $300,000 to $2,016,120. [Doc. 54, Exh. N]. The greater amount apparently is what Mr. Harvey believes is necessary to effect *nalyeeh*, which, under Navajo law, is a demand by a victim to be made whole for an injury. [Doc. 1 at 2]. By letter dated June 20, 2007 and received by counsel for Mr. Harvey on July 16, 2007, the administrative claim was denied as untimely. [Id., Exh. O at 1]. On January 29, 2008, Mr. Harvey filed his *FTCA Medical Malpractice Complaint*, alleging that providers at the FDIH breached the applicable standard of care. [Doc. 1 at 6].

On June 12, 2009, the United States filed *Defendant's Motion to Dismiss Certain Claims Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(h)(3)* [Doc. 53] on the ground that all claims of negligence preceding May 1, 2004 (the date two years prior to the filing of Mr. Harvey's administrative claim) must be dismissed as time-barred. [Doc. 54 at 1-2]. The United States makes clear that it "is not seeking to dismiss the claims related to the surgery,

which claims were timely filed." [Doc. 65 at 1].

## II. ANALYSIS

### A. *Defendant's Motion to Dismiss Certain Claims Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(h)(3)* [Doc. 54]

#### 1. Standard of Review: Fed.R.Civ.P. 12(b)(1), (h)(3)

The United States has moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and (h)(3), which allow for the dismissal of a claim for lack of subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1), (h)(3). Generally, motions to dismiss for lack of jurisdiction will come in the form of (1) a facial attack, in which case the movant merely challenges the sufficiency of the complaint, requiring the district court to accept the allegations in the complaint as true, or (2) a factual attack, where the movant goes beyond the allegations in the complaint and challenges the facts upon which subject matter jurisdiction depends. Paper, Allied-Industrial, Chemical And Energy Workers Intern. Union v. Continental Carbon Co., 428 F.3d 1285, 1292 (10th Cir. 2005). The United States here has launched a factual attack, meaning this Court "must look beyond the complaint and has wide discretion to allow documentary and even testimonial evidence. . . ." Id. Reference to evidence outside the pleadings does not convert the motion to dismiss into a motion for summary judgment; instead, only when resolution of the jurisdictional question is intertwined with the merits of the case is it necessary to convert a Rule 12(b)(1) motion into a Rule 56 motion. Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995).

## 2. **The Federal Tort Claims Act**

Under the doctrine of sovereign immunity, "'the United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" Weaver v. United States, 98 F.3d 518, 520 (10th Cir.1996) (*quoting* United States v. Sherwood, 312 U.S. 584, 586 (1941)). The threshold question in any suit in which the United States is a defendant, then, must be whether Congress has specifically waived sovereign immunity, and a plaintiff's recovery is limited by the express terms of the United States' waiver. Louis v. United States, 54 F.Supp.2d 1207, 1209 (D.N.M. 1999).

In this case, the FTCA sets the parameters of the United States' liability. Pursuant to the FTCA, the United States is made liable (within the scope of its waiver of sovereign immunity)

> for personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1) (emphasis added). The FTCA also provides, in pertinent part, that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues. . . ." 28 U.S.C. § 2401(b). Finally, "the determination of when a claim, or cause of action, accrues is a matter of federal, not state, law." Kynaston v. United States, 717 F.2d 506, 508 (10th

Cir. 1983).

As an initial matter, it bears repeating that the United States *does not* seek dismissal of Mr. Harvey's claims to the extent those claims are based on the allegedly negligently performed surgery of May 4, 2004. [See Doc. 1 at 7 ("Surgery was performed on May 4, 2004. The surgeon fell below the standard of care in the timing, operative procedures, and the aftercare."); see also Doc. 65 at 1 ("Defendant is not seeking to dismiss the claims related to the surgery, which claims were filed timely.")]. Instead, as the United States correctly points out, Mr. Harvey has asserted two sets of claims: (1) those arising as a result of the initial February 6, 2004 alleged failure to diagnose and treat the fractured hand; and (2) those arising as a result of the alleged negligently performed surgery of May 4, 2004. [See Doc. 1 at 6-7]. Accordingly, the Court addresses only Mr. Harvey's claims of negligence to the extent they derive from the February 6, 2004 alleged failure to diagnose and treat his fractured hand.

Because the FDIH is located in the State of Arizona, the Court turns to Ninth Circuit authority to determine when a medical-malpractice claim accrues for purposes of the FTCA. See Landreth By and Through Ore v. United States, 850 F.2d 532, 533 (9th Cir. 1988) (noting that, in FTCA medical-malpractice case, "[t]he date on which a claim accrues is determined by federal law.").[1] The Ninth Circuit has held "[i]n a medical malpractice case

---

[1] On September 29, 2009, this Court entered a *Memorandum Opinion and Order* in which it determined that the substantive law to be applied in this FTCA action would be the law of the Navajo Nation. [See Doc. 68]. Notwithstanding the prior ruling that the law of the Navajo Nation would be the substantive law to be applied to Mr. Harvey's claims, federal authority makes clear, and this Court similarly determines, that, with respect to the issue of

under the FTCA, a claim accrues when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its cause." Id. (*citing* United States v. Kubrick, 444 U.S. 111 (1979)).  In other words, "[a] claim accrues when a plaintiff knows that he has been injured and who has inflicted the injury." Winter v. United States, 244 F.3d 1088, 1090 (9th Cir. 2001).  Accrual *does not* depend upon the plaintiff's "'awareness . . . that his injury has been negligently inflicted.'" Id. (*quoting* Kubrick, 444 U.S. at 123).it feels   Instead, "[i]t is well settled that the limitations period begins to run when the plaintiff has knowledge of injury and its cause, and not when the plaintiff has knowledge of legal fault." Rosales v. United States, 824 F.2d 799, 805 (9th Cir. 1987).

Further refining the rule of Kubrick, the Ninth Circuit has held that, in the specific context of failure-to-warn, -treat, or -diagnose claims, "a claim accrues under the FTCA when the plaintiff knows or should have known about the development of a pre-existing condition into a more serious medical problem." Ignacio v. United States, 1997 WL 129315, at *1 (9th Cir. Mar. 20, 1997) (unpublished) (*citing* Augustine v. United States, 704 F.2d 1074, 1078 (9th Cir. 1983).  The rationale underlying this refinement is that the injury in such failure-to-act cases is

> the *development* of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment. In this type of case, it is only when the patient becomes aware or through the exercise of reasonable diligence should have become aware of the development of a

---

*accrual* of claims asserted pursuant to the FTCA, federal law applies.  Specifically, both the Ninth and Tenth Circuits have held that federal law determines when an FTCA medical-malpractice action begins to accrue.  See Landreth, 850 F.2d at 533; Kynaston, 717 F.2d at 508.

> pre-existing problem into a more serious condition that his cause of action can be said to have accrued for purposes of section 2401(b).

Augustine, 704 F.2d at 1078 (emphasis in original).  For this reason, the plaintiff in Augustine, having first learned in October 1975 that there was a bump on his upper left palate, but not knowing until November 1977 that this growth was cancerous, was not necessarily untimely in filing his administrative claim on April 17, 1978.  As the Ninth Circuit explained,

> [t]he issue of accrual . . . thus depend[ed] upon when and if plaintiff discovered or through the exercise of reasonable diligence should have discovered that the failure of his doctors to diagnose, treat, or warn him led to his deteriorating physical condition.  That, in turn, depend[ed] upon whether the attending dentists properly diagnosed Augustine's condition and adequately informed him of the need to obtain prompt supplemental care. . . .

Id.

In this case, Mr. Harvey contends that he first presented to the FDIH on February 6, 2004 with, among other things, a hurt hand, but that there was no medical intervention, no splinting or immobilization of his hand, no instructions not to move his fingers, and no consultation with orthopedics, notwithstanding that an X-ray revealed a fracture. [Doc. 1 at 6].  Instead, he was provided Motrin for the pain and told to return in a month if his condition did not improve. [Doc. 54; Exh. O at 2].  He alleges that he returned to the FDIH on March 5, 2004, but that "no health care provider bothered to look at the X-ray report." [Doc. 1 at 6].  Accordingly, he received nothing more than additional pain medication and was told that his

9

hand should start feeling better in a few weeks. [Doc. 54; Exh. O at 2]. It was not until March 29, 2004 that Mr. Harvey learned that his hand was broken and he was sent for an orthopedics consultation. [Doc. 1 at 6]. On April 20, 2004, Mr. Harvey was told he required surgery. [Doc. 1 at 3; Doc. 54; Exh. O at 2].

It thus would have been April 20, 2004 that Mr. Harvey should through reasonable diligence have become aware that FDIH health care providers had originally mis-diagnosed a fracture that ultimately required surgery as, instead, a swollen and painful hand injury treatable with Motrin and ice. He would also have known on April 20, 2004 that X-rays taken on February 6, 2004 should not have been noted in his medical record as "all ok." [See Doc. 54; Exh. A]. Accordingly, Mr. Harvey's failure-to-diagnose/failure-to-treat claims accrued on April 20, 2004, when he learned that more extensive care (*i.e.,* surgery) was required to treat an injury that health care providers originally believed could be taken care of with painkillers and an ice pack. See Augustine, 704 F.2d at 1078 (explaining that, in failure-to-diagnose/failure-to-treat cases, claim accrues when plaintiff learns or with reasonable diligence should have know of the development of the original problem into a more serious condition posing a greater danger to the patient or requiring more extensive treatment). Because Mr. Harvey did not file his administrative claim until May 1, 2006, the medical-malpractice claims that he asserts arose as a result of the initial February 6, 2004 alleged failure to diagnose and treat his fractured hand are time-barred.

### III. CONCLUSION

For the reasons stated more fully herein, the Court will grant the United States' motion to dismiss.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion to Dismiss Certain Claims Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(h)(3)* [Doc. 53] is **GRANTED**;

**IT IS FURTHER ORDERED** Plaintiff's medical-malpractice claims, to the extent they arise as a result of the initial February 6, 2004 alleged failure to diagnose and treat the fractured hand, be and hereby are **DISMISSED WITH PREJUDICE**.

**SO ORDERED** this 9th day of March, 2010, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge