## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**FRANCIS LEON HARVEY**,

        Plaintiff,

    vs.                       No. 08CV107 MCA/RLP

**UNITED STATES OF AMERICA,**

        Defendant.

## MEMORANDUM OPINION AND ORDER

      **THIS MATTER** comes before the Court on *Defendant's Motion for Reconsideration of Memorandum Opinion and Order (Doc. 68)* [Doc. 71], filed October 15, 2009, and *Plaintiff's Motion for Reconsideration of Memorandum Opinion and Order (Doc. 81)* [Doc. 82], filed March 16, 2010. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court denies both motions.

## I. BACKGROUND

      The facts underlying this action have been thoroughly set out in two previously entered *Opinions* of this Court. [see Docs. 68, 81]. Those facts are incorporated here by reference and will be restated only as is necessary to provide an understanding of the motions now under consideration.

      On February 6, 2004, Plaintiff Francis Leon Harvey, an enrolled member of the Navajo Tribe who resides on that portion of the Navajo Reservation located in the State of

New Mexico, presented at the Fort Defiance Indian Hospital ("FDIH") walk-in clinic complaining of hand, leg, and rib pain resulting from a fall on ice.  The FDIH is located on the Navajo Reservation in the State of Arizona, and is operated by Indian Health Services ("IHS"), an agency of the United States government.

Health care providers at the FDIH gave Mr. Harvey Motrin and an ice pack for pain, and noted in his medical record, "X-rays all ok."  Notwithstanding this notation, a radiology department report of X-rays of Mr. Harvey's right hand stated that "[t]here is a fracture of base of the fifth metacarpal of the right hand which enters the carpometacarpal joint." [Doc. 1 at 3].

Between February 6, 2004, when he first presented as a patient, and May 1, 2006, when he filed his administrative claim (Form 95 *Claim for Damage, Injury, or Death*) with the Department of Health and Human Services, Mr. Harvey returned to the FDIH on a number of occasions and for a number of reasons.  For example, on March 5, 2004, Mr. Harvey went back to the clinic, complaining of continued pain.  Another note made in his medical record that day again stated that "X-rays were ok," and Mr. Harvey was given more pain medication. [Doc. 1 at 3].

When Mr. Harvey returned to the clinic on March 29, 2004, however, he learned that his hand was broken and, therefore, "knew that there was a failure to properly diagnose his injury. . . ." [Doc. 83 at 3].  Mr. Harvey also learned at that time that his hand was broken when he first presented to the FDIH on February 6, 2004. [Doc. 54 at 12].  Mr. Harvey visited the FDIH's orthopedic clinic the next day, and was provided a splint for comfort.

When he returned to the orthopedic clinic on April 20, 2004, surgery was advised. That surgery was performed on May 5, 2004 and, according to Mr. Harvey, in substantard fashion. [See Doc. 1 at 3].

Over the course of the next two years, Mr. Harvey continued to return to the FDIH, both for follow-up visits and also to be seen for pain, swelling, and other complaints. For instance, after his first follow-up appointment on May 10, 2004, Mr. Harvey returned to the clinic on May 13, 2004 because of pain in his hand. He went back on June 10, 2004, again complaining of pain and swelling, and also advising that his hand was turning yellow. The record reveals several more visits to the FDIH's orthopedic clinic between June 10, 2004 and April of 2006, when Mr. Harvey's hand "was still not right." [Doc. 1 at 5]. At that point, Mr. Harvey retained counsel and filed his administrative claim, which was received by the Department of Health and Human Services on May 1, 2006. He described the basis of the claim as a "[f]ailure to diagnose broken bone in right hand. Surgery to repair fell below the standard of care." In the box marked "Date and Day of Accident" Mr. Harvey wrote "May 2004. [Doc. 54; Exh. K]. On January 29, 2008, Mr. Harvey filed his *FTCA Medical Malpractice Complaint* [Doc. 1].

Thereafter, on October 6, 2008, Mr. Harvey filed a motion for partial summary judgment, arguing that the applicable law in this matter is Navajo law, because that is the "law of the place" (*i.e.*, the Navajo Nation) where the allegedly negligent act occurred. [See generally Docs. 17, 18]. The Court granted the motion by *Memorandum Opinion and Order* entered September 29, 2009. [Doc. 68]. On October 15, 2009, the government moved the

Court to reconsider its September 29, 2009 *Order*. [Doc. 71].

On June 12, 2009, the government filed a motion to dismiss certain claims as time-barred. [See Docs. 53, 54]. The Court granted the motion by *Memorandum Opinion and Order* entered March 9, 2010. [Doc. 81]. On March 16, 2010, Mr. Harvey moved for reconsideration of the Court's March 9, 2010 *Order*.

## II. ANALYSIS

### A. *Defendant's motion for Reconsideration of Memorandum Opinion and Order (Doc. 68)* [Doc. 71]

#### 1. Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure and "Motions for Reconsideration"

As previously explained, both Mr. Harvey and the government have each filed a "motion for reconsideration" of this Court's *Orders*. [See Docs. 71, 82]. The Federal Rules of Civil Procedure, however, recognize no such motion. See Hatfield v. Bd. of County Comm'rs for Converse County, 52 F.3d 858, 861 (10th Cir. 1995). Instead, motions styled as "motions for reconsideration" are generally construed in one of two ways. If filed within 10 days of entry of the challenged order, the motion is treated as a motion to alter or amend the judgment pursuant to Fed.R.Civ.P. 59(e).[1] Price v. Philpot, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005). If filed *more* than 10 days after entry of the challenged order, the motion is treated as one for relief from judgment pursuant to Fed.R.Civ.P. 60(b).[2] Id. Under

---

[1] Rule 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed.R.Civ.P. 59(e).

[2] Rule 60(b) provides:

Fed.R.Civ.P. 6(a), weekends and intermediate holidays are excluded from the computation of the 10-day period.  See United States v. Terrell, 6 Fed.Appx. 763, 764 n.1 (10th Cir. 2001); see also Fed.R.Civ.P. 6(a).[3]  The distinctions between Rule 59 motions and those filed pursuant to Rule 60 are important primarily for appellate purposes, since a Rule 59 motion, unlike a Rule 60 motion, will toll the time for filing a notice of appeal.  Also, the scope of review varies depending on the type of motion.  See Hawkins v. Evans, 64 F.3d 543, 546 (10th Cir. 1995).  For this Court's consideration, however, it is sufficient to note that "every order short of a final decree is subject to reopening at the [Court's] discretion. . . ."  Price,

---

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Fed.R.Civ.P. 60(b).

[3]  Revised Rule 6, which became effective December 1, 2009, now provides, in pertinent part, that "[w]hen the period is stated in days or a longer unit of time . . . count every day, including intermediate Saturdays, Sundays, and legal holidays. . . ." Fed.R.Civ.P. 6(a)(1)(B) (2010 ed.).  Because the government filed its motion for reconsideration in October 2009, the Court applies the version of Rule 6 then in effect.

420 F.3d at 1167 n.9 (*quoting* <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 12 (1983)).

"A motion for reconsideration is an extreme remedy to be granted in rare circumstances." <u>Brumark Corp. v. Samson Resources Corp.</u>, 57 F.3d 941, 944 (10th Cir. 1995). The decision to grant reconsideration is committed to the sound discretion of the district court, which, in exercising that discretion, considers whether there has been (1) an intervening change in the law, (2) new evidence, or (3) the need to correct clear error or to prevent manifest injustice. <u>Id.</u> Thus, relief under Rule 59(e) may be appropriate where the district court has misapprehended the facts, a party's position, or the controlling law. <u>Servants of Paraclete v. Does</u>, 204 F.3d 1005, 1012 (10th Cir. 2000); <u>accord</u> <u>Barber ex rel. Barber v. Colorado Dept. of Revenue</u>, 562 F.3d 1222, 1228 (10th Cir. 2009). Similarly, "'[r]elief under Rule 60(b) is extraordinary and may only be granted in exceptional circumstances.'" <u>Cashner v. Freedom Stores, Inc.</u>, 98 F.3d 572, 576 (10th Cir. 1996) (*quoting* <u>Bud Brooks Trucking, Inc. v. Bill Hodges Trucking Co.</u>, 909 F.2d 1437, 1440 (10th Cir.1990)).

In its motion for reconsideration, the government states that this Court erred in concluding that Navajo law, rather than the law of the State of Arizona, constitutes the "law of the place" in this matter. [Doc. 72 at 1]. More specifically, the government asks that the Court rethink its determination that <u>Montana v. United States</u>, 450 U.S. 544 (1981) dictates the choice-of-law outcome. [<u>See</u> Doc. 77 at 3-4].

Montana involved a claim by the Crow Tribe of Montana that it possessed the

authority (through treaties, its inherent power as a sovereign; and its purported ownership of

the bed of the Big Horn River) to regulate hunting and fishing by non-Indians on lands within

the Crow reservation but owned in fee simple by non-Indians.  Montana v. United States, 450

U.S. 544, 547 (1981).  In an attempt to resolve the issue, the United States, for itself and as

fiduciary for the Tribe, brought suit, seeking (1) a declaration quieting title to the bed of the

Big Horn River in the United States as fiduciary for the Tribe; (2) a declaration that it and

the Tribe had sole authority to regulate hunting and fishing within the reservation; and (3) an

injunction requiring the State of Montana to obtain the Tribe's permission before issuing

hunting or fishing licenses for use on the reservation.  Id. at 549.

The district court denied the request for relief but the Court of Appeals for the Ninth

Circuit reversed, holding that (1) the United States held the bed and banks of the Big Horn

River in trust for the Crow Tribe; (2) the Tribe was authorized to regulate nonmembers'

hunting and fishing within the reservation; and (3) nonmembers permitted to hunt and fish

within the reservation were subject to the fish and game laws of the State of Montana.

Montana, 450 U.S. at 550.

The United States Supreme Court reversed and remanded.  Montana, 450 U.S. at 567.

As an initial matter, the Court concluded that the circuit had erroneously determined that the

United States held the bed and banks of the Big Horn River in trust for the Tribe; instead,

title to the bed and banks passed from the United States to the State of Montana when

Montana was admitted into the Union.  Id. at 556-557.  Although the Supreme Court agreed

with the circuit that the Tribe was authorized to (1) prohibit nonmembers from hunting or fishing on land belonging to the Tribe or held by the United States in trust for the Tribe; and (2) set certain conditions for those nonmembers it *did* permit to hunt and fish on such lands, the Court did not agree with the circuit's conclusions that the Tribe could (3) regulate, but not prohibit, hunting and fishing on fee-patented lands by nonmember resident owners; and (4) completely prohibit hunting and fishing on reservation lands by non-Indians who did not occupy that land.  Id. at 557.

In considering the scope of the Tribe's authority to regulate or prohibit activities of non-Indians occurring on reservation lands owned by non-Indians, the Court looked to the same sources of law as had the Ninth Circuit, but reached a result different from that reached by the circuit.  To be sure, whereas the circuit had construed the First Treaty of Fort Laramie of 1851, and the Second Treaty of Fort Laramie of 1868 (hereinafter "The Crow Treaties") as sources of a regulatory power from which the Tribe derived authority to regulate hunting and fishing by nonmembers on nonmember land, the Supreme Court, mindful of the purposes and effects of the Crow Treaties,[4] declined to interpret them as giving to the Tribe the power

---

[4]  The Court explained the purposes of the 1851 treaty as to (1) assure safe passage for settlers across the lands of various Indian Tribes; (2) compensate the Tribes for the loss of buffalo, other game animals, timber, and forage; (3) delineate tribal boundaries; (4) promote intertribal peace; and (5) establish a way of identifying Indians who "committed depredations" against non-Indians.  Montana, 450 U.S. at 557-558.  The 1868 treaty both reduced the size of the Crow territory as designated by the 1851 treaty, and established the Crow reservation, providing that it be set aside for "absolute and undisturbed use and occupation" of Indians.  Id. at 558.  As a result, the United States became obligated to "prohibit most non-Indians from residing on or passing through reservation lands used and occupied by the Tribe, and, thereby, arguably conferred upon the Tribe the authority to control fishing and hunting on those lands."  Id. at 558-559.

or authority to restrict or prohibit these activities on any land other than "land on which the Tribe exercises 'absolute and undisturbed use and occupation.'" Montana, 450 U.S. at 558-559.

Nor was the Supreme Court persuaded, as the circuit had believed, that "the federal trespass statute, 18 U.S.C. § 1165, somehow 'augmented' the Tribe's regulatory powers over non-Indian land." Montana, 450 U.S. at 561. To the contrary, reasoned the Court, as the statute's reach was "limited to lands owned by Indians, held in trust by the United States for Indians, or reserved for use by Indians[,]" the statute more likely "suggest[ed] the absence of" tribal authority to regulate hunting and fishing on non-Indian reservation lands. Id.

The Court then addressed the issue of inherent tribal sovereignty, which the Ninth Circuit had viewed as an additional source of the Tribe's power to regulate non-Indian hunting and fishing on non-Indian lands. See Montana, 450 U.S. at 563-567. Notwithstanding that there was a time when "the tribes were self-governing sovereign political communities[,]" United States v. Wheeler, 435 U.S. 313, 322-323 (1978), the tribes, through their incorporation within the territory of the United States, and by virtue of various treaties and statutes, were divested of "many of the attributes of sovereignty" that they had previously possessed. See Montana, 450 U.S. at 563. Accordingly, while tribes may still exercise their inherent tribal power over such acts as punishing tribal offenders, determining tribal membership, and others involving only the relations among members of a tribe, "implicit divestiture of sovereignty has been held to have occurred [in those areas] involving the relations between an Indian tribe and nonmembers of the tribe." Id. at 564. Because the

9

regulation of hunting and fishing by nonmembers on reservation lands no longer owned by the Tribe "b[ore] no clear relationship to tribal self-government or internal relations," reasoned the Court, the concept of inherent tribal sovereignty did not support the Ninth Circuit's holding.  See id. at 564-565.

The fact that the tribes enjoy diminished sovereignty as a result of their dependent status does not, however, mean that they are entirely powerless to regulate the activities of non-Indians occurring on reservation lands.  To the contrary, "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands."  Montana, 450 U.S. at 565.  As examples, the Court noted that tribes possess inherent authority to (1) tax, license, or otherwise regulate activities of nonmembers who enter consensual relationships with the tribe or its members through commercial dealing, contracts, leases, or other arrangements; and (2) exercise civil authority over the conduct of non-Indians on fee lands within reservations when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.  Id. at 565-566.

It was this second Montana exception that this Court relied on in concluding that, under the circumstances presented here, "if the United States were a private person, it would be amenable to a personal-injury lawsuit in a court of the Navajo Nation [and, consequently,] it follows that the applicable law is the law of the Navajo Nation."  [Doc. 68 at 18].  The Court reached this conclusion after considering, in general, the special trust relationship the United States shares with Native Americans and, in specific, the federal government's

10

obligation to provide Native Americans with high-quality health care. This Court then determined that the second Montana exception applies because "when the United States, pursuant to the special trust relationship, undertakes to provide medical care for the native population *and* provides that care in a negligent manner, the United States unquestionably engages in activity that directly affects the tribe's health and welfare." [Doc. 68 at 18 (emphasis in original)].

In its reply to Mr. Harvey's response to its motion for reconsideration, the government

> recognizes this Court has found that the second Montana exception regarding the health and welfare of the Tribe does apply here. This is the basis of Defendant's request for reconsideration. Defendant respectfully renews its request to this Court to reconsider whether Montana intended a single act of medical malpractice in a facility, not controlled in any fashion by the Navajo Nation, to supplant the language of the Federal Tort Claims Act.

[Doc. 77 at 3-4]. At first blush, the government's suggestion as to the inapplicability of Montana's second exception to the facts of this case has some appeal, particularly since the exception focuses on harm to the Tribe, not the individual members of the Tribe. This much was made clear in Strate v. A-1 Contractors, 520 U.S. 438 (1997), wherein the Supreme Court deemed the Montana exceptions inapplicable to a "run-of-the-mill" automobile collision between two non-Indians on state-owned land running through the Fort Berthold Indian Reservation. With respect to the second exception, the Court explained that "[u]ndoubtedly, those who drive carelessly on a public highway running through a reservation endanger all in the vicinity, and surely jeopardize the safety of tribal members.

But if <u>Montana</u>'s second exception require[d] no more, the exception would severely shrink the rule." <u>Strate v. A-1 Contractors</u>, 520 U.S. 438, 457-458 (1997).

That it is the health and welfare of the *Tribe itself* that must be affected by the alleged misconduct has been reaffirmed in other cases that have addressed the issue. For example, the United States District Court for the District of Montana found that <u>Montana</u>'s second exception did not provide the Crow Tribal Court with jurisdiction over a civil suit arising from personal injuries sustained when an enrolled member of the Crow Tribe was struck by a motorcycle and injured while on property owned by the State, but within reservation boundaries. While the injuries sustained clearly affected the health and welfare of the individual plaintiff, explained the court, "[e]mphasis [was] properly placed" on the effect of the conduct on the Tribe, since to place focus elsewhere would "destroy[] the distinction made by the Supreme Court between matters that do affect the welfare of the Tribe, and those matters that do not." <u>Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians of Montana</u>, 560 F.Supp. 213, 216-217 (D.Mont. 1983). Moreover, while "[a] personal injury obviously affects the health and welfare of the injured individual, . . . an individual is not a Tribe." <u>Id.</u>

Other courts that have considered the second exception of <u>Montana</u> have similarly concentrated on how the conduct in question directly affects the health or welfare of the Tribe, as opposed to the health or welfare of individual tribal members. <u>See</u>, <u>e.g.</u>, <u>Cardin v. De La Cruz</u>, 671 F.2d 363, 366 (9th Cir. 1982) (both <u>Montana</u> exceptions gave Quinault Indian Tribe jurisdiction to enforce tribal building, health, and safety regulations against non-

12

Indian operating allegedly dangerous and unsanitary grocery store on  reservation land operator owned in fee); Swift Transp., Inc. v. John, 546 F.Supp. 1185, 1193 (D.Ariz. 1982) (automobile collision on reservation directly affected health and welfare of individuals involved but did not have similar effect on Tribe; accordingly, "circumstances d[id] not give rise to Tribal Court jurisdiction under Montana's second jurisdictional category).

Thus, if the facts underlying the instant action were analogous to those presented in Strate ("run-of-the-mill" automobile accident involving two non-Indians on state highway running through reservation); Nat'l Farmers Union Ins. Cos. (injuries sustained after having been struck by motorcycle on state-owned property within reservation); or Swift (motor-vehicle accident on federal highway on reservation), this Court would be more likely to accept, with little additional analysis, the government's argument that Montana's second exception does not apply to "[the] single act of medical malpractice" that has been alleged here.  [Doc. 77 at 3].

But the facts surrounding Mr. Harvey's situation and those set forth in Strate,  Nat'l Farmers Union Ins. Cos., and Swift are not *truly* analogous because in none of the three earlier cases was the special trust relationship between the United States and Native Americans implicated, as it is here.  In other words, the "single act of medical malpractice" to which the government refers must nevertheless be viewed through the prism of the special trust relationship which, among other things, obligates the United States "'to meet the national goal of providing the highest possible health status to Indians and to provide existing Indian health services with all resources necessary to effect that policy.'"  McNabb for

13

McNabb v. Bowen, 829 F.2d 787, 792 (9th Cir. 1987) (*quoting* 25 U.S.C. § 1602).

In its earlier *Memorandum Opinion and Order* of September 29, 2009, this Court considered the special trust relationship as a source from which flows the United States' duty to provide quality health care to Native Americans.  It was on this basis that the Court determined that "when the United States, pursuant to the special trust relationship, undertakes to provide medical care for the native population *and* provides that care in a negligent manner, the United States unquestionably engages in activity that directly affects the tribe's health and welfare."  [See Doc. 68 at 18].   That said, concluded the Court, "the instant situation is one that comes within the second exception set forth in Montana." [Id.].

Such a conclusion might be considered to be somewhat out of the ordinary, but it is not unprecedented, particularly in medical malpractice cases.  For example, in Cheromiah v. United States, another court from this District held that "the law of the place" for purposes of the plaintiffs' FTCA medical malpractice action was the law of the Acoma tribe, since the alleged negligence occurred in the emergency room of an IHS-owned and operated hospital that was located within the bounds of Acoma tribal land.  Cheromiah v. United States, 55 F.Supp.2d 1295, 1301-09 (D.N.M. 1999).  The court then concluded that the facts before it fell within both Montana exceptions, as (1) the hospital was operated pursuant to a lease with the Tribe, thereby bringing the hospital within the first exception covering activities of nonmembers who entered into consensual relationships with the Tribe; and (2) alleged malpractice on the part of a federally operated hospital, through which the government had undertaken to provide emergency medical services, "ha[d] a direct and substantial impact on

14

the health and welfare of the Tribe, more than would a simple isolated tort between individuals." Id. at 1305.  The court in Cheromiah did not specifically mention the special trust relationship between the United States and Native Americans, but the Court did highlight the contrast between "a routine tort" occurring on the reservation and medical malpractice committed by "the United States government[, having] undertaken the responsibility of providing the primary emergency medical care to the members of the Acoma Tribe." Id.

Similarly, in Williams v. United States, the United States District Court for the Western District of North Carolina, in reliance on Cheromiah, concluded that the law of the Eastern Band of the Cherokee Indians (assuming that Cherokee law provided a cause of action) was "the law of the place" for purposes of the plaintiff's FTCA action alleging medical malpractice occurring when a non-Indian was refused treatment at a hospital emergency room located on the Cherokee Indian Reservation.  Williams v. United States, 1999 WL 33320440, at *4 (W.D.N.C. 1999).  The court in Williams determined that a tribal court would have had civil authority over the hospital, if the hospital were a private person, because "[t]he hospital 'directly affect[ed] the tribe's . . . health or welfare.'" Id. (quoting Strate, 520 U.S. at 446; but see, e.g., LaFromboise v. Leavitt, 439 F.3d 792, 796 (8th Cir. 2006) (in action alleging medical malpractice committed in IHS-operated facility located within Turtle Mountain Indian Reservation in North Dakota, the "law of the place" was the law of the State of North Dakota).

This Court has considered the relevant pleadings; reread and re-reviewed the applicable and pertinent case law and treatises;[5] and reexamined the reasoning and conclusions contained in its September 29, 2009 *Memorandum Opinion and Order* here at issue; having done so, the Court is not persuaded that the government has demonstrated that, in the earlier *Memorandum Opinion and Order*, this Court misapprehended the facts, the government's position, or the controlling law.  See Barber, 562 F.3d at 1228.  Instead, the Court believes that determinations made and conclusions drawn in its September 29, 2009 *Memorandum Opinion and Order* are sound and supported by the law.  For this reason, *Defendant's Motion for Reconsideration of Memorandum Opinion and Order (Doc. 68)* will be denied.

**B.** ***Plaintiff's Motion for Reconsideration of Memorandum Opinion and Order (Doc. 81) [Doc. 82]***

In a *Memorandum Opinion and Order* entered March 9, 2010, this Court determined that Mr. Harvey's claims for medical malpractice accrued on April 20, 2004, because it was on that day that he was told he required surgery. [Doc. 81 at 10].  The Court reasoned that "[i]t thus would have been April 20, 2004 that Mr. Harvey should through reasonable diligence have become aware that FDIH health care providers had originally mis-diagnosed a fracture that ultimately required surgery as, instead, a swollen and painful hand injury treatable with Motrin and ice." [Id.].  The Court explained that as of April 20, 2004, Mr. Harvey, who had learned on March 29, 2004 that his hand was broken, would have known

_____

[5] Felix S. Cohen, COHEN'S HANDBOOK OF FEDERAL INDIAN LAW (2005).

that X-rays taken on February 6, 2004 should not have been noted in his medical record as "all ok." [Id.].  Consequently, concluded the Court, all claims asserted by Mr. Harvey and arising as a result of the initial February 6, 2004 alleged failure to diagnose and treat his fractured hand were time-barred, since he initiated his administrative action on May 1, 2006. [Id.].

Mr. Harvey now asks the Court to reconsider its conclusion that his claims accrued on April 20, 2004, on the ground that the Court has confused the need for more serious *treatment* (*i.e.*, surgery) than he had been receiving, with an awareness that his *condition* had worsened as a result of health care providers' failure to diagnose and treat.  Mr. Harvey is most emphatic that his *condition* did not worsen between February 6, 2004, the day on which he first presented to the FDIH, and May 5, 2004, when surgery was performed.[6]  To the contrary, insists Mr. Harvey, his condition was the same on both days and at all times in between, inasmuch as he was suffering from a broken bone that required surgery. [See Doc. 83 at 2].

In its March 9, 2010 *Memorandum Opinion and Order*, the Court determined that Mr. Harvey "has asserted two sets of claims: (1) those arising as a result of the initial February

---

[6]   [See Doc. 83 at 2, 5 "Mr. Harvey's condition which required surgery had not changed from the first X-Ray taken in February to the second Xray taken in March. Both X-Rays showed a fractured base of the fifth metacarpal[;]" "That Mr. Harvey continued to need surgery on April 20, 2004, did not indicate a "worsening" of his condition. It rather indicated a continuation of his condition[;]" "[T]he standard of care required surgery on February 6, 2004 and that need for surgery continued through April 20, 2004 until the surgery was actually performed on May 5, 2004[;]" "To reiterate, the record does not indicate any change of condition between February 6 through May 5, 2004 which precipitated the need for surgery." (emphasis in original)].

6, 2004 alleged failure to diagnose and treat the fractured hand; and (2) those arising as a result of the alleged negligently performed surgery[,]" [Doc. 81 at 7], and the Court does not believe that this determination was made in error.  To be sure, in the box marked "Basis of Claim" on his Form 95 *Claim for Damage, Injury, or Death*, Mr. Harvey wrote, "Failure to diagnose broken bone in right hand[.] Surgery to repair fell below the standard of care." [Doc. 54; Exh. L].  Moreover, in a detailed letter seeking reconsideration of the denial of his administrative claim, counsel for Mr. Harvey states:

> The injury that Mr. Harvey is claiming in his FTCA claim against the United States is that his hand did not heal properly after he fell on the ice and hurt it.  *This failure to heal was proximately caused by the failure to timely diagnose and operate on the fracture.*  This conduct was continuous from February 6, 2004, his first visit, until May 5, 2004, when they finally performed the surgery.  *This failure to heal was also proximately caused by substandard surgery and/or after surgery care. . . .*

[Id.; Exh. O, letter of Sept. 4, 2007 at 4-5 (emphasis added)].  Finally, "Mr. Harvey does not dispute the facts as set forth by the Defendant in its [memorandum in support of its motion to dismiss certain claims]," [Doc. 59 at 2], which facts include the allegation that Mr. Harvey's "claims consist of 1) A failure to diagnose broken bone in right hand, and 2) Surgery to repair fell below the standard of care." [Doc. 54 at 3].  Accordingly, the Court does not believe that it erroneously determined that Mr. Harvey asserts two sets of claims, the second of which the government does not seek to dismiss. [See Doc. 65 at 1 "Defendant is not seeking to dismiss the claims related to the surgery, which claims were filed timely."].

For purposes of Mr. Harvey's claims based upon the malpractice of FDIH providers occurring *prior* to the allegedly substandard surgery performed May 5, 2004, the alleged injury resulting from which was the failure of his hand to heal, applicable cases hold that "[i]n a medical malpractice case under the FTCA, a claim accrues when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its cause." Landreth By and Through Ore v. United States, 850 F.2d 532, 533 (9th Cir. 1988) (*citing* United States v. Kubrick, 444 U.S. 111 (1979)).

Here, Mr. Harvey knew on March 29, 2004, when he again returned to the FDIH and was referred to the orthopedic clinic, that his hand was broken.  Mr. Harvey does not dispute this, explaining that he "knew there was a failure to properly diagnose his injury on March 29, 2004, when the second X-Ray again showed that his hand was broken." [Doc. 83 at 3]. Nor does Mr. Harvey dispute that "[o]n March 29, 2004, he was informed that his hand was broken . . . when he first presented in February, 2004." [Doc. 54 at 12; see also Doc. 59 at 2 ("Mr. Harvey does not dispute the facts as set forth by the Defendant in its Memorandum [Doc. 54]. . . .")].   The law does not require a plaintiff to know "that the acts inflicting the injury may constitute medical malpractice[,]" Kubrick, 444 U.S. at 113, although Mr. Harvey does in fact admit that he "clearly knew on March 29, 2004, sufficient facts to alert him that the health care providers had breached the standard of care." [Doc. 59 at 8].

Once again, for reasons set forth more fully above, this Court has concluded that Mr. Harvey has asserted two sets of claims—those arising from a failure to diagnose and operate on his fractured hand in a timely manner, and those arising from a substandardly performed

surgery. [See Doc. 54; Exh. O, letter of Sept. 4, 2007 at 4-5].  Among the injuries flowing

from the initial failure to diagnose is that Mr. Harvey's hand did not heal properly. [See id.

Exh. O, letter of Sept. 4, 2007 at 4-5 ("The injury that Mr. Harvey is claiming in his FTCA

claim  . . . is that his hand did not heal properly after he fell on the ice and hurt it.  This

failure to heal was proximately caused by the failure to timely diagnose and operate on the

fracture.")].  It was precisely because Mr. Harvey's hand was not healing properly that he

returned to the FDIH on March 29, 2004.  At that time, he learned that his hand was broken

and, in fact, *had been* broken when he first walked into the FDIH clinic on February 6, 2004.

Accordingly, it would have been March 29, 2004 that Mr. Harvey would or should have

discovered the claimed injury, *i.e.*, that a failure to diagnose a fracture caused improper

healing of his hand.

        The Court does not believe that its interpretation misconstrues Mr. Harvey's position,

and again notes that the government has not sought to dismiss the second set of claims (*i.e.*,

those arising from the surgery itself), which it agrees were timely filed.  [See Doc. 65 at 1

"Defendant is not seeking to dismiss the claims related to the surgery, which claims were

filed timely."].

        Accordingly, the Court is not persuaded that holding Mr. Harvey to an accrual date

of April 20, 2004, as set forth in its *Memorandum Opinion and Order* of March 9, 2010,

serves a manifest injustice; if anything, the circumstances support a determination that Mr.

Harvey's claims of medical malpractice, to the extent those claims are based on FDIH

providers' failure to diagnose and treat his fractured hand, accrued on the earlier date of

March 29, 2004.  However, because the government has not asked the Court to reconsider its earlier accrual-date finding, and it would be unfair to Mr. Harvey for the Court *sua sponte* at this point to deem March 29, 2004 the date of accrual of his first set of medical malpractice claims, the Court will stand by its earlier conclusion that Mr. Harvey's claims, to the extent they arose from a failure to diagnose and operate, accrued on April 20, 2004.

## III. CONCLUSION

For the reasons stated more fully herein, the Court denies both motions for reconsideration.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion for Reconsideration of Memorandum Opinion and Order (Doc. 68)* [Doc. 71], is **DENIED**;

**IT IS FURTHER ORDERED** *Plaintiff's Motion for Reconsideration of Memorandum Opinion and Order (Doc. 81)* [Doc. 82] is **DENIED**.

**SO ORDERED** this 30th day of September, 2010, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge